No. 23-3936

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**LEAH PRIDA,**

        Plaintiff-Appellant,

  -vs.-

**OPTION CARE ENTERPRISES, INC., et al.,**

        Defendants-Appellees.

On Appeal from the United States District Court for the Northern District of Ohio
(No. 5:23-cv-00905)

---

## BRIEF OF PLAINTIFF-APPELLANT

---

Thomas W. Connors (0007226)
Warner Mendenhall (0070165)
Brian Unger (0096884)
MENDENHALL LAW GROUP
190 North Union Street, Suite 201
Akron, Ohio 44304
(330) 535-9160
tconnors@warnermendenhall.com
warner@warnermendenhall.com
brian@warnermendenhall.com

*Attorneys for Plaintiff-Appellant*
*Leah Prida*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................ ii

TABLE OF AUTHORITIES ........................................................ iiv

STATEMENT REGARDING ORAL ARGUMENT ...................................... 1

JURISDICTIONAL STATEMENT ................................................ 2

ISSUES PRESENTED .................................................................... 3

STATEMENT OF THE CASE ........................................................ 4

SUMMARY OF ARGUMENT ........................................................ 6

ARGUMENT .............................................................................. 11

   I.    Standard of Review ............................................................ 11

   II.   The Legal Standards for Plausibly Pleading a Religious Belief and
        Practice ......................................................................... 11

     A. The Current Case Law Definition of Religion. ................. 11

     B. The Ordinary Public Meaning of the Term "Religion" as Used in the
        First Amendment. ....................................................... 16

     C. The Line Between Religious and Secular. ....................... 17

     D. The First Amendment's Substantive Definition of Religion ............ 20

     E. The *Africa* and *Fallon* Cases from the Third Circuit. ...................... 21

       1. The *Africa/Fallon* Test ......................................... 21

       2. The *Africa/Fallon* Test is Not Supported by *Seeger* and *Welsh*. .. 23

       a) *Africa/Fallon's* Definition of Religion Does Not Include the
         Element of Source of Morality as Required by *Seeger* and
         *Welsh*………………………………………………………..…23

       b) *Africa's* "Ultimate Question" Criterion ....................... 25

ii

c) *Africa's* "Comprehensiveness" Criterion. ...................................28

d) *Africa's* "Structural Characteristics" Criterion...........................31

e) *Fallon*'s Interpretation that Religious Beliefs and Political, Sociological and Philosophic Views are Mutually Exclusive is Contrary to *Seeger* and *Welsh*. ...................................................32

III.    The District Court Erred in Determining that Plaintiff has not Plausibly Pled the Religious Beliefs and Practices and Other Elements of Her Religious Accommodation Claim. .......................35

1.  Plaintiff Need Only Plausibly Plead Her Claim not Establish a Prima Facie Case at the Pleading Stage........................................35

2.  Plaintiff has Plausibly Pled a Religious Belief or Practice under *Seeger* and *Welsh*. ........................................................................36

a) The Sincerity of Plaintiff's Religious Belief or Practice is not Disputed. ...................................................................................36

b) Plaintiff's Belief or Practice is Religious under *Seeger* and *Welsh*. .......................................................................................37

c) Defendants' Desire to Avoid Accommodation was a Motivating Factor in its Decision to Discharge Plaintiff. .............................42

d) Plaintiff's Religious Belief or Practice is One But-For Cause of Her Discharge. ...........................................................................43

3.  Even Though the *Africa/Fallon* Pleading Standard is Not Applicable, it Has Been Met in the Present Case. .......................45

IV.    The District Court Erred in Determining that Plaintiff has not Plausibly Pled the Oppositional Practice and Causation Elements of her Retaliation Claim. ........................................................................47

V.    The District Court Erred by Dismissing Plaintiff's O.R.C. §4112.02 Claim *Sua Sponte* on Grounds not Raised by Defendants. ..............49

CONCLUSION.................................................................................................50

CERTIFICATE OF COMPLIANCE ............................................................52

CERTIFICATE OF SERVICE......................................................................52

iii

# <u>TABLE OF AUTHORITIES</u>

CASES                                                                    PAGE(S)

*Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444 (7th Cir. 2013)..............29

*Africa v. Com. of Pa.*, 662 F.2d 1025 (3rd Cir.1981) ..................................... passim

*Arizona State Legislature v. Arizona Independent Redistricting Com'n,*
    576 U.S. 787 (2015)...........................................................................16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................36

*Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020)…….……………16, 44

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ...................................33

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...........................................16

*Doe v. Oberlin College,* 60 F.4th 345 (2023) .................................................. 49, 50

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc.,* 575 U.S. 768 (2015)......... 42, 43, 44

*EEOC v. Consol. Energy, Inc.,* 860 F.3d 131 (4th Cir. 2017)…………………….29

*EEOC v. Union Independiente de la Autoridad de Acueductos*
    *y Alcantarillados de P.R.*, 279 F.3d 49 (1st Cir. 2002)………..………………29

*Employment Div., Dept. of Human Resources of Ore. v. Smith*,
    494 U.S. 872 (1990)............................................................................33

*Fallon v. Mercy Catholic Medical Center of Southeastern Pennsylvania*,
    877 F. 3d 487 (3rd Cir. 2017) .................................................................. passim

*George v. Youngstown State University*, 966 F. 3d 446 (6th Cir. 2020). ...............48

*Hall v. Ky. Baptist Homes for Child., Inc.,* 215 F.3d 627 (6th Cir. 2000)..............42

*Johnson v. University of Cincinnati*, 25 F.3d 561 (6th Cir. 2000) .................. 15, 47

*Jones v. First Kentucky Nat'l Corp.,* No. 84-5067,

1986 WL 398289 (6th Cir.) .................................................................27

*Kassa v. Detroit Metro Convention & Visitors Bureau*,
    672 Fed. Appx. 575 (6th Cir. 2017)....................................................50

*Keene v. City and County of San Francisco*, No. 22-16567,
    2023 WL 3451687 (9th Cir., May 15, 2023).......................................28

*Kennedy v. Bremerton School District,* 597 U.S. 507 (2022), ...........................9, 33

*Lawhead v. Brookwood Mgmt. Co., LLC*, No. 5:22-cv-00886,
    2023 WL 2691718 (N.D. Ohio Mar. 29, 2023)........................................... 22, 45

*Marks v. U.S.*, 430 U.S. 188 (1977).........................................................14

*Pedriera v. Kentucky Baptist Homes for Children, Inc*., 579 F.3d 722,
    (6th Cir. 2009)............................................................... 11, 36, 42

*Savel v. MetroHealth System*, 96 F.4th 932 (6th Cir 2024)............................. 36, 47

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996 ),....................................13

*Swierkiewecz v. Sorema N.A.,* 534 U.S. 506 (2002)......................................... 36, 50

*Tagore v. United States*, 735 F. 3d 324 (5th Cir. 2013)………………………..29

*Tepper v. Potter*, 505 F.3d 508, (6th  Cir. 2007). ....................................35

*Thomas v. Review Bd. of Indiana Employment Sec. Division*,
    450 U.S. 707 (1981)..............................................................28

*Torres v. Madrid*, 592 U.S. 306 (2021) ..................................................16

*Town of Greece v. Galloway*, 572 U.S. 565 (2014).....................................8

*U.S. v. Seeger*, 380 U.S. 163 (1965) ............................................. passim

*Ulrich v. Lancaster Gen. Health*, No. 22-cv-4945,
    2023 WL 2939585 (E.D. Pa. Apr. 13, 2023).........................................22

*Welsh v. U.S.*, 398 U.S. 333 (1970), .............................................................. passim

*Wisconsin v. Yoder,* 406 U.S.205 (1972)........................................................ passim

CONSTITUTIONAL PROVISIONS

FIRST AMENDMENT ............................................................................... PASSIM

STATUTES

28 U.S.C. § 1291 ...........................................................................................2

28 U.S.C. § 1331 ...........................................................................................2

28 U.S.C. §1343 ...........................................................................................2

29 C.F.R. §1605.01 .....................................................................................15

Civil Rights Act of 1964, §701, et seq., 42 U.S.C. §2000e et seq
    ("Title VII")……………………………………………………………passim

O.R.C. §4112.02 ................................................... 3, 5, 10, 11, 12, 49, 50

OTHER AUTHORITIES

1 Johnson, A Dictionary of the English Language (1755). ....................................17

118 Cong. Rec.-Senate 705 (1972).........................................................11

2 S. Johnson, A Dictionary of the English Language (1755)……………6, 7, 16, 17

94 Cong. Rec.-Senate 7277 (1948)........................................................15

94 Cong. Rec.-Senate 7304 (1948)........................................................18

E. Blevins, A Fixed Meaning of "Religion" in the First Amendment,
    53 Willamette L. Rev. 1, 4 (2016) ........................................................13

J. Collins, A. Bryner, Defining Religion and Accommodating
    Religious Exercise, 99 In. L. J. 515, 528 (2024) .................................12

J. Knechtle, If We Don't Know What It Is, How Do We Know

If Its Established, 41 Brandeis L.J. 521 (2003) ...................................................12

M. Rhea, Denying and Defining Religion Under the First Amendment,
72 La. L. Rev. 1095, 1104 (2012)...........................................................................12

R. Colombo, When Exemptions Discriminate: Unlawfully Narrow Exemptions
to Vaccine Mandates, 44 W. New Eng. L. R. 293, 324, n. 177 (2022)...............13

S. Collier, Beyond Seeger/Welsh: Redefining Religion Under the Constitution,
31 Emory L.J. 973, (1982) ......................................................................................12

## STATEMENT REGARDING ORAL ARGUMENT

The central issue in this appeal is the substantive definition of religion under the First Amendment, and thus the operative definition of religion under Title VII. Due to the importance of that question, Plaintiff-Appellant requests an oral argument and submits that argument will aid the decisional process.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. §1343. It entered an order dismissing Plaintiff's Amended Complaint on October 24, 2023. Order, R. 17. Plaintiff appealed that order on November 20, 2023. Notice of Appeal, R. 18. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

**ISSUES PRESENTED**

1.  Whether Plaintiff plausibly pled her beliefs and practices were religious for purposes of her reasonable accommodation claims under Title VII and O.R.C. §4112.02.

2.  Whether Plaintiff plausibly pled the oppositional practice and causation elements of her retaliation claim.

3.  Whether the district court erred in its *sua sponte* dismissal of Plaintiff's O.R.C. §4112.02 claim.

## STATEMENT OF THE CASE

Plaintiff Leah Prida ("Prida") was employed by Defendants OptionCare Enterprises, Inc. and Clinical Specialties, Inc. ("Defendants"), located in Hudson, Ohio, from October 7, 1996, through March 9, 2022. Amended Complaint, R. 10, PageID# 93, 103-04, ¶¶11, 63. Prida requested a religious accommodation from Defendants' policy requiring a Covid-19 vaccine and weekly Covid-19 testing on December 28, 2021. *Id.,* PageID# 98, ¶40. Prida received an exemption from the vaccine mandate, but not the weekly testing requirement, on February 17 and 22, 2022. *Id*., PageID# 99, ¶¶42-43.

Defendants' testing policy involves the use of Ethylene Oxide to sterilize nasal swabs inserted into the nose during the testing process. *Id*., PageID# 99, ¶40. Ethylene Oxide is a known carcinogen. *Id*., PageID# 100, ¶46.

In her accommodation request, Prida stated that she was a Christian, who follows the principles of the Bible. R. 12-1, PageID# 142. She pointed to the statement that "your body is the temple of the holy spirit within you, which you have from God…by all means, glorify God in your body," from Corinthians 6:19-20. *Id.* She objected to the use of Ethylene Oxide, a known carcinogen in Covid-19 PCR testing, because it risked harm to her body contrary to guidance from the Bible and the holy spirit to avoid such harm. She stated that she could not "in good conscience…risk the harm that may come from …the chemicals in the testing." *Id.*

4

On February 25, 2022, and March 1, 2022, Prida sent Defendants communications referencing the religious basis for seeking accommodation from the testing requirement. Amended Complaint, R. 10, PageID# 100, ¶¶45, 51. On March 2, 2022, Prida requested the use of alternative means of testing without the use of Ethylene Oxide. *Id*., ¶58. Defendants stated that that option was not being offered, and that testing with this chemical was company policy that would not be changed. *Id.,* ¶58.

After the termination of her employment on March 9, 2022, Prida filed a discrimination charge with the EEOC, and received a Notice of Right to Sue on February 2, 2023. *Id.,* PageID# 104, ¶¶64-65.

Prida filed a complaint in this case on May 2, 2023, amended on July 21, 2023, asserting religious accommodation and retaliation claims under the Civil Rights Act of 1964, §701, et seq., 42 U.S.C. §2000e et seq. ("Title VII") and Ohio Rev. Code §4112.02 ("O.R.C. §4112.02"). *Id*. Defendants filed their answer and a motion to dismiss on August 4, 2023. R. 12; R. 13.

The district court granted the motion to dismiss on the grounds that Prida's asserted beliefs were secular, not religious, on October 24, 2023. This appeal followed on November 20, 2023.

## SUMMARY OF ARGUMENT

Prida's beliefs and practices at issue in this case are religious under the ordinary public meaning of the term "religion" used in the First Amendment and Title VII. Congress adopted Title VII on the understanding that its use of the term "religion" encompassed the same concepts included in the First Amendment. The Supreme Court provided a functional test for defining religious beliefs in *U.S. v. Seeger*, 380 U.S. 163 (1965) and *Welsh v. U.S.*, 398 U.S. 333 (1970), describing nontraditional beliefs as religious if they occupy a place in a person's life parallel to the place filled by God in traditionally religious persons. However, the Supreme Court has not defined the place in traditionally religious persons' lives filled by God and therefore has not provided a substantive definition of religion.

A substantive definition of religion is found in Samuel Johnson's dictionary, which the Supreme Court regularly relies on to provide the ordinary public meaning of terms used in the U.S. Constitution and its amendments at the time they were adopted. Johnson's dictionary defines religion as "virtue founded on reverence of God" and defines virtue as "moral goodness." 2 S. Johnson, A Dictionary of the English Language (1755) ("2 Johnson (1755)"). This ordinary public meaning is consistent with *Seeger* and *Welsh,* which provide that "[m]ost of the great religions…embodied the idea of a Supreme Being or a Supreme Reality -

6

a God - who communicates to man in some way a consciousness of what is right and…what is wrong…" *Welsh*, 398 U.S. at 340.

*Seeger* and *Welsh* broadly define religious beliefs to include nontraditional beliefs but draw a line between religious beliefs and nonreligious (secular) beliefs. Beliefs are secular to the extent that they are "in no way related to a Supreme Being" (*Seeger*, at 186), or do "not rest at all upon moral, ethical, or religious principle but instead rest[] solely upon considerations of policy, pragmatism, or expediency." *Welsh*, 398 U.S. at 342-43. Later, the Supreme Court referenced secular beliefs in dicta as involving those "based on purely secular considerations …" *Wisconsin v. Yoder,* 406 U.S. 205, 215 (1972). Johnson's dictionary defined secular as "not spiritual; relating to affairs of the present world," and defined spiritual as "immaterial." 2 Johnson (1755).

In drawing the line between religious and secular beliefs necessary to determine qualification for a religious exemption, *Seeger* and *Welsh* held that the "task is to decide whether the beliefs professed by [an applicant] are sincerely held and whether they are in his own scheme of things, religious." *Welsh*, 398 U.S. at 339. *Seeger* emphasized that "[t]he validity of what he believes cannot be questioned." *Seeger*, 380 U.S. at 184.

Prida's sincerity is undisputed. The only issue is whether her beliefs regarding her applying chemical testing on her body, are in her "own scheme of things, religious."

The district court held that Prida's professed beliefs were secular and not validly religious, relying on a line of cases based on *Africa v. Com. of Pa*., 662 F.2d 1025 (3rd Cir.1981) and *Fallon v. Mercy Catholic Medical Center of Southeastern Pennsylvania*, 877 F. 3d 487 (3rd Cir. 2017). *Africa* defined beliefs as religious if they addressed ultimate questions, were comprehensive and involved external structural characteristics. The *Africa/Fallon* test has not been adopted by this Circuit.

The *Africa/Fallon* test is not consistent with *Seeger* and *Welsh*. *Seeger* and *Welsh* deem beliefs religious if they involve morality based on God or the Supreme Being as broadly interpreted. They deem beliefs as secular only if they are in no way related to a Supreme Being or rest solely on pragmatism.

In defining religious beliefs, *Seeger* and *Welsh* look to the state of mind of the believer and whether she considers her understanding of right and wrong as somehow conveyed by God or the Supreme Being. *Africa* and *Fallon* define religious beliefs as involving comprehensive doctrines about ultimate questions and external structural characteristics, which covers some but not all religious

8

beliefs defined by Supreme Court precedent. *Seeger* and *Welsh* are consistent with the historical ordinary public meaning of religion reflected in Johnson's dictionary.

The district court assumes without explanation that philosophic, sociological, political, and medical views are purely secular, and therefore cannot be aspects of religious belief or practice. *Seeger* and *Welsh* hold to the contrary that such views can be aspects of moral action founded on God (the Supreme Being). This comports with *Kennedy v. Bremerton School District,* 597 U.S. 507, 524 (2022), which recently held that the Free Exercise Clause protects the right of religious believers "of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts."

Prida alleged that applying carcinogenic chemicals in testing on her body would be morally wrong based on her understanding of God's guidance reflected in the Bible and through the Holy Spirit. Accordingly, she has plausibly pled a religious belief and practice for purposes of her religious accommodation and retaliation claims.

Prida has also plausibly pled the oppositional practice and causation elements of her retaliation claim given her allegations timely specifying her opposition and pointing to similarly situated employees who were exempted.

Finally, the district court erred in sua sponte dismissing Prida's O.R.C. §4112.02 claim without notice on grounds not raised in the dismissal motion briefing.

## ARGUMENT

### I.   Standard of Review.

This Court reviews a district court's grant of a motion to dismiss *de novo*. *Pedriera v. Kentucky Baptist Homes for Children, Inc*., 579 F.3d 722, 727 (6th Cir. 2009).

### II.   The Legal Standards for Plausibly Pleading a Religious Belief and Practice.

#### A. The Current Case Law Definition of Religion.

The present case turns on the definition of religion as used in the First Amendment and Title VII. The district court dismissed plaintiff's religious discrimination claims on the grounds that "[t]he facts pleaded, if taken as true, do not support the notion that Prida's belief in the sanctity of her body is a religious belief protected under Title VII or Ohio Rev. Code §4112.02." Opinion, R. 16, at 12, PageID# 236. Title VII of the Civil Rights Act of 1964 was amended by the Equal Employment Opportunity Enforcement Act in 1972, with the understanding that "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief…" The sponsor of this provision, Senator Jennings Randolph, stated when presenting this amendment that "the term 'religion' as used in the Civil Rights Act of 1964 encompasses, as I understand it, the same concepts as are included in the first amendment—not merely belief, but also conduct; the freedom to believe, and also the freedom to act." 118 Cong. Rec.-Senate 705 (1972). This

11

legislative history demonstrates that the definition of the term "religion" as used in Title VII is the same as the term "religion" as used in the First Amendment.

Despite its centrality to our constitutional structure, neither the U.S. Constitution nor the Supreme Court have provided a working definition of religion under the First Amendment. M. Rhea, Denying and Defining Religion Under the First Amendment, 72 La. L. Rev. 1095, 1104 (2012) ("Despite the significance of the Free Exercise and Establishment Clauses of the Constitution, defining religion remains a herculean task that the United States Supreme Court has essentially avoided to date."); J. Knechtle, If We Don't Know What It Is, How Do We Know If Its Established, 41 Brandeis L.J. 521 (2003) ("The threshold question of whether religion is involved in a case determines whether the Free Exercise and Establishment Clauses apply, yet the United States Supreme Court has tried to avoid the difficult task of defining religion."); S. Collier, Beyond Seeger/Welsh: Redefining Religion Under the Constitution, 31 Emory L.J. 973, (1982) ("In general, however, while the Supreme Court has discussed the issue a few times, the definition of religion under the First Amendment remains an unsettled question of constitutional law.").

The Supreme Court has provided what has widely been described as a functional definition of religion. J. Collins, A. Bryner, Defining Religion and Accommodating Religious Exercise, 99 In. L. J. 515, 528 (2024) ("In the Supreme

Court's formulation, a belief was religious so long as it occupied a position in the believer's life parallel to that occupied by traditional faiths in the lives of traditional believers."); R. Colombo, When Exemptions Discriminate: Unlawfully Narrow Exemptions to Vaccine Mandates, 44 W. New Eng. L. R. 293, 324, n. 177 (2022) ("The prevailing approach with the courts is to use a 'functional' definition of religion, which compares the role that the belief in question 'plays in the individual's or group's life' as compared to the role played by traditional religions in the life of believers, with the qualifier that the belief be somehow tethered to the supernatural."); E. Blevins, A Fixed Meaning of "Religion" in the First Amendment, 53 Willamette L. Rev. 1, 4 (2016) ("The functional definitions of religion are contrasted with "substantive definitions, which seek to grasp the essence of religion.").

The Supreme Court has not addressed the definition of religion since *Seeger*, 380 U.S. 163, and *Welsh*, 398 U.S. 333, with the exception of dicta in *Wisconsin v. Yoder,* 406 U.S. 205, 215 (1972) ("A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief."). As the Supreme Court explained in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), the precedentially binding portions of its opinions are limited to "not only the result

but also those portions of that opinion necessary to that result." *Id*., at 67. *Yoder's* observation is dicta, because it was undisputed throughout the litigation that the belief at issue was religious and therefore its commentary on the distinction between secular and religious was not necessary to the result in that case.

The opinion in *Seeger* is binding on this Court to the extent it is necessary to its result. *Welsh* is different because it was a plurality decision. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. U.S*., 430 U.S. 188, 193 (1977) (internal quotations omitted). In *Welsh*, the concurring justice accepted "the prevailing opinion's conscientious objector test" and its conclusion that "petitioner's beliefs are held with the required intensity." *Welsh*, 398 U.S. at 367-368.

The only binding precedent provided by the Supreme Court on the definition of religion is the functional test set forth in *Seeger* and *Welsh*, i.e. "[a] sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption…" *Seeger*, 380 U.S. at 175. Or, as *Welsh* described it, beliefs that "occupy in the life of that individual 'a place parallel to that filled by ... God' in traditionally religious persons." *Welsh*, 398 U.S. at 340. The precedential effect of this definition of

14

religion is reflected in the Equal Employment Opportunity Commission's embrace of the *Seeger/Welsh* definition of religion in its interpretation of Title VII. 29 C.F.R. §1605.01. As this Court has held, such an interpretation is to be given great deference by the courts. *Johnson v. University of Cincinnati*, 25 F.3d 561, 579, n. 8 (6th Cir. 2000).

Nonetheless, the *Seeger/Welsh* test is merely comparative; it defines beliefs as religious if they function like traditional theistic beliefs. It does not, however, delineate how traditionally theistic beliefs function. That is the issue presented in this case.

Although *Seeger* and *Welsh* provide guidance on addressing the definition of religion as used in the First Amendment, they do not provide a substantive definition.[1] The district court's ruling in the present case, however, is based on a line of cases from the Third Circuit which do purport to provide a substantive definition. *Africa*, supra; *Fallon*, supra. This Circuit has not adopted the reasoning of *Africa*, nor has it otherwise devised such a definition. As discussed below, *Africa* does not provide a persuasive basis for defining religion given *Seeger* and *Welsh*, and therefore should not be adopted by this Circuit.

---

[1] While *Seeger* and *Welsh* define religion as used in the Universal Military and Training Act of 1948 (the "Selective Service Act"), its legislative history shows that the term was used in the same sense as used in the First Amendment. ("[T]he fact that we cannot understand and fully appreciate the religious faith and the spiritual beliefs of the conscientious objectors should make us overcautious… We should make sure that we give to him all the protections to which he is entitled under the Constitution." 94 Cong. Rec.-Senate 7277 (1948).)

## B. The Ordinary Public Meaning of the Term "Religion" as Used in the First Amendment.

Under Supreme Court precedent, the definition of religion must be based on the ordinary public meaning of the term "religion" as used in the First Amendment and incorporated in Title VII. *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008) ("In interpreting this text [the Second Amendment] we are guided by the principle that [t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.") (internal quotations omitted); *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 654 (2020) ("This Court normally interprets a statute in accordance with the ordinary public meaning of its terms at the time of its enactment.").

In determining the ordinary public meaning of the U.S. Constitution and the Bill of Rights, the Supreme Court looks to the dictionaries in use at the time they were framed, particularly Samuel Johnson's dictionary. *Heller*, 554 U.S. at 581; *Torres v. Madrid*, 592 U.S. 306, 312 (2021); *Arizona State Legislature v. Arizona Independent Redistricting Com'n,* 576 U.S. 787, 813 (2015). The primary definition of the term "religion" in Johnson's dictionary is "virtue as founded upon reverence of God." 2 Johnson (1755). The primary definition of "virtue" is "moral goodness." 2 Johnson (1755). "Reverence" is defined as "veneration, respect." 2

Johnson (1755). From this we may conclude that the ordinary public meaning of "religion" as used in the First Amendment is morality based on respect for God.

"God" is primarily defined as "the Supreme Being." 1 Johnson, A Dictionary of the English Language (1755) ("1 Johnson (1755)"). "Supreme" is defined as "highest in authority" and "being" is defined as "the person existing" or "existence." 2 Johnson (1755). "Moral" is defined as "relating to the practice of men towards each other, as it may be virtuous or criminal; good or bad." 2 Johnson (1755). From this we may conclude that the ordinary public meaning of "God" at the time of the First Amendment was the highest authority in existence regarding the morality of our relations with each other.

### C. The Line Between Religious and Secular.

As to the distinction between secular and religious, "secular" is defined as "not spiritual; relating to the affairs of the present world." 2 Johnson (1755). The primary usage for the word "God" cited by Johnson is "God is a spirit, and they that worship him must worship him in spirit and in truth." 1 Johnson (1755). "Spiritual" is defined as "distinct from matter; immaterial; incorporeal." 2 Johnson (1755). "Truth" is defined as "conformity of notions to things" with "notion" being "thought" or "idea" and "thing" being "whatever is" and "not a person." 2 Johnson (1755). From this we may conclude that the ordinary public meaning of the secular/religious distinction at the time of the First Amendment is that secular

relates solely to worldly, material matters, while "religion" involves relationship with God in the spiritual and ideational realms on which moral actions are based.

*Seeger* construed the term "religious belief" as used in the conscientious objector exemption in the Selective Service Act, which was described in legislative history as involving "[t]he determination of…whether [a registrant] is or is not a conscientious objector in the sense that the Constitution of the United States gives him religious freedom." 94 Cong. Rec.-Senate 7304 (1948). *Seeger* held that the test for determining whether a belief was religious was "essentially an objective one, namely, does the claimed belief occupy the same place in the life of the objector as an orthodox belief in God holds in the life of one clearly qualified for exemption." *Seeger*, 380 U.S. at 184.

*Seeger* further explained that an exception to the exemption contained in the Selective Service Act, which drew a line between the religious and the secular, "must be interpreted narrowly." *Seeger*, 380 U.S. at 186. *Seeger* observed that "the words 'merely personal' seems to us to restrict the exception to a moral code which is not only personal but which is in ***no*** way related to a Supreme Being." *Id*., at 186 (emphasis added).

*Welsh* applied *Seeger* to a nontheistic conscientious objector stating the following:

> We do not think that [the Selective Service Act's] exclusion of those persons with 'essentially political, sociological, or philosophical views

18

or a merely personal code' should be held to be read to exclude those
who hold strong beliefs about our domestic and foreign affairs or even
those whose conscientious objection … is founded to a substantial
extent upon considerations of public policy. The two groups of
registrants that obviously do fall within these exclusions from the
exemption are those whose objections to war are not deeply held, and
those whose objection to war ***does not rest at all*** upon moral, ethical,
or religious principle but instead rests ***solely*** upon considerations of
policy, pragmatism, or expediency."

*Welsh*, 398 U.S. at 342-343 (emphasis added).

*Yoder* followed *Welsh* in acknowledging that "a determination of what is a
'religious' belief or practice entitled to constitutional protection may present a
most delicate question" but distinguished such practices from those "based on
***purely*** secular considerations." *Yoder*, 406 U.S. at 215 (emphasis added).

*Seeger* and *Welsh* do not construe the term "religion" as including all beliefs.
They held that moral and ethical beliefs based on a Supreme Being are religious,
while beliefs which are "in no way related to a Supreme Being" or which "rest[]
solely upon considerations of policy, pragmatism, or expediency" are not religious.
*Seeger*, 380 U.S. at 186; *Welsh*, 398 U.S. at 342-43. This interpretation is
consistent with the ordinary public meaning of the term "religion," i.e. virtue
[moral goodness] as founded upon reverence for God [the Supreme Being], as set
forth in Johnson's dictionary.

The test for determining what is religious belief in *Seeger* and *Welsh* is
functional in that it focuses on whether "beliefs play the role of a religion and
function as a religion in the registrant's life." *Welsh*, 398 U.S. at 339; *Seeger*, 380

U.S. at 165-66. *Seeger* and *Welsh* "made it clear that these … beliefs … need not be confined in either source or content to traditional or parochial concepts of religion." *Welsh*, at 339, citing *Seeger*, at 186. This approach was taken in the context of claims for religious exemptions that were not traditional. See *Welsh*, at 341 ("For example, in filling out their conscientious objector applications, Seeger put quotation marks around the word 'religious,' but Welsh struck the word 'religious' entirely and later characterized his beliefs as having been formed 'by reading in the fields of history and sociology.'").

In *Seeger* and *Welsh*, the Supreme Court simply assumed that the religious nature of traditional beliefs in God was understood, and that Seeger and Welsh need only show that their nontraditional or nontheistic beliefs had a parallel function in their lives. In the present case, Prida does hold a traditional belief in God and is being told that her beliefs and practices are not religious as she has applied them in her life and in the present case. As Prida is a traditional believer, the *Seeger*/*Welsh* functional test for nontraditional believers would not be directly applicable.

### D. The First Amendment's Substantive Definition of Religion.

While *Seeger* and *Welsh* only provide a functional definition of religion, they do provide guidance for a substantive definition of religion that would address the issue in this case:

What is necessary under *Seeger* for a [belief] to be religious…is that this [belief] stem from the registrant's moral, ethical or religious beliefs about what is right or wrong and that these beliefs be held with the strength of traditional religious convictions. Most of the great religions of today and of the past have embodied the idea of a Supreme Being or a Supreme Reality - a God - who communicates to man in some way a consciousness of what is right and should be done, of what is wrong and therefore should be shunned."
*Welsh*, 398 U.S. at 340.

The substantive element of the definition of religion reflected in *Seeger* and *Welsh* is that some form of relationship with the Supreme Being is the foundation for the concepts of "what is right and should be done, of what is wrong" and therefore should not be done. *Welsh*, at 340, discussing *Seeger. Seeger* and *Welsh* define "religion" as a relationship with the Supreme Being which provides the basis for an individual's conceptualization of "moral, ethical or religious beliefs about what is right or wrong." *Id*. This interpretation by *Seeger* and *Welsh* is also consistent with the ordinary public meaning of the term "religion" described in Johnson's dictionary.

### E. The *Africa* and *Fallon* Cases from the Third Circuit.

### 1. The *Africa/Fallon* Test.

The district court in the present case relied on a line of cases following *Fallon v. Mercy Catholic Medical Center of Southeastern Pennsylvania*, 877 F. 3d 487 (3rd Cir. 2017), for the determination that religion does not include beliefs "that amount to 'essentially political, sociological, or philosophical views.'"

Opinion, R. 16 at 7-8, PageID# 231-32; *Lawhead v. Brookwood Mgmt. Co., LLC*, No. 5:22-cv-00886, 2023 WL 2691718 (N.D. Ohio Mar. 29, 2023); *Ulrich v. Lancaster Gen. Health*, No. 22-cv-4945, 2023 WL 2939585 (E.D. Pa. Apr. 13, 2023). *Fallon* in turn was based on *Africa v. Com. of Pa.,* 662 F.2d 1025, 1032 (3rd Cir. 1981), which noted that "[t]he Supreme Court has never announced a comprehensive definition of religion" and applied what it described as a "modern analysis" consisting of "a 'definition by analogy' approach," which was "at once a refinement and an extension of the 'parallel'-belief course first charged by the Supreme Court in *Seeger*." *Id*., at 1032.

*Africa's* definition included three "'useful indicia' to determine the existence of a religion." *Id*. Those are whether the beliefs at issue 1) "address fundamental and ultimate questions having to do with deep and imponderable matters"; 2) are "comprehensive in nature" and "consist[] of a belief-system as opposed to an isolated teaching"; and 3) are "recognized by the presence of certain formal and external signs." *Id*.

*Fallon* applied this test in the context of a hospital employee who sought a religious exemption from a mandatory flu vaccination. Fallon believed that "one should not harm their [sic] own body and strongly believes that the flu vaccine may do more harm than good." *Fallon*, 877 F.3d at 492. Fallon "conclude[d] that if

he yielded to coercion and consented to the hospital mandatory policy, he would violate his conscience as to what is right and what is wrong." *Id.*

The *Fallon* court, however, dismissed Fallon's religious discrimination claim under Title VII, at the pleading stage. The court determined that "[Fallon] simply worries about the health effects of the flu vaccine, disbelieves the scientifically accepted view that it is harmless to most people, and wishes to avoid this vaccine." *Id.*, 877 F.3d at 492. Based on this, the court held that Fallon's "concern that the flu vaccine may do more harm than good – is a medical belief, not a religious one," and that his "one moral commandment [do not harm your own body] is an 'isolated moral teaching'; by itself, it is not a comprehensive system of beliefs about fundamental or ultimate matters." *Id.* The *Fallon* court also held that Fallon's views "are not manifested in formal and external signs." *Id.*

    **2.  The *Africa/Fallon* Test is Not Supported by *Seeger* and *Welsh.***

        **a)  *Africa/Fallon's* Definition of Religion Does Not Include the Element of Source of Morality as Required by *Seeger* and *Welsh.***

*Africa/Fallon's* definition of secularism and religion is inconsistent with the guidance of *Seeger* and *Welsh*, and far afield of the ordinary public meaning of the term "religion" as reflected in Johnson's dictionary. The secular is narrowly defined by *Welsh* as "rest[ing] solely upon considerations of policy, pragmatism, or expediency," or by *Seeger* as involving "a moral code which is not only personal

23

but which is the sole basis for [one's] belief and is in no way related to a Supreme Being." *Welsh*, 398 U.S. at 342-343; *Seeger*, 380 U.S. at 186. On the other hand, *Seeger*'s and *Welsh*'s application of the definition of religion essentially deem any form of moral belief or practice to be a form of religion based on the Supreme Being, regardless of how the believer characterizes her views, as long as she is sincere.

*Africa* and *Fallon* equate religion with traditional organized religions having comprehensive doctrines and formal structural characteristics. The term "religion" under the First Amendment certainly includes this form of religion, but it is not limited to it. The "essence" of this term, as used in the First Amendment, is virtue or moral goodness based on a relationship with God, defined as the Supreme Being.

*Africa/Fallon* and the district court improperly narrow the definition of religion and thereby expand the definition of secularism by ignoring the part that morality and its source plays in such definitions. *Africa* limits religion to established doctrines or formal practices, thereby narrowing the scope of religion and expanding the scope of the secular since the two definitions are mutually exclusive.

*Seeger* and *Welsh* held that what is necessary for a belief to be religious is that it "stem from 'moral, ethical and religious beliefs about what is right or

wrong.'" *Welsh*., 398 U.S. at 340. A determination that beliefs are "political, sociological or philosophical" or even "founded to a substantial extent upon considerations of public policy" does not resolve the issue of whether they are religious under Supreme Court precedent. See *Welsh*, at 343. A belief is secular and not religious only if it does "not rest at all upon moral, ethical or religious principle" or it involves a "moral code…which is in ***no way*** related to the Supreme Being." *Welsh*, 398 U.S. at 342; *Seeger*, 380 U.S. at 186 (emphasis added).

A determination that the medical, political, sociological and philosophical are purely secular cannot be made under *Seeger* and *Welsh* without addressing the moral basis for the actions or practices applying the medical, political, sociological and philosophical. These fields of knowledge may inform action or practice, but do not define morality, which involves what should or should not be done. Title VII protects "all aspects of religious observance and practice." *Seeger* and *Welsh* preclude a determination that entire fields of knowledge are purely secular, without assessing the moral basis of the actions or practices by which such knowledge is deployed.

### b) *Africa's* "Ultimate Question" Criterion.

*Africa*'s "ultimate question" criterion does overlap with *Seeger* and *Welsh* in that it is described as "questions having to do with, among other things, life and death, right and wrong, and good and evil." *Africa*, 662 F.2d at 1033. The concepts

of "right and wrong and good and evil" are closely allied and fall within the ordinary public meaning of religion as morality founded on a relationship with the Supreme Being, reflected in Johnson's dictionary and *Seeger* and *Welsh*. *Africa*'s reference to the question of "life and death" apparently relates to "human mortality, or the meaning and purpose of life." *Africa,* supra at 1033. This matter too would fit within *Seeger*'s and *Welsh*'s concept of a relationship with the Supreme Being that conveys an awareness of morality, in the sense that morality implies a right way of being, which would function as a purpose of life.

*Africa*'s definition of religion is not consistent with *Seeger* and *Welsh* because it makes no reference to the understanding that religion involves morally good practice derived from a "Supreme Being" which somehow conveys an awareness of right and wrong action.

*Welsh* tells us that "[w]hat is necessary under *Seeger* for a [belief] to be religious…is that this [belief] stem from the [believer's] moral, ethical or religious beliefs about what is right or wrong…" *Welsh*, 398 U.S. at 339-40. A necessary element of the definition of religion is the idea of right or wrong, or morality, not a vague all-inclusive concept of "fundamental and ultimate questions having to do with deep and imponderable matters." *Africa*, 662 F.2d at 1032. *Seeger*'s and *Welsh*'s necessary element is grounded on the ordinary public meaning of the term "religion" as reflected in Johnson's dictionary and as understood by the framers of

26

the First Amendment. *Africa*'s substitute criterion has no clear reference point and is not a valid reflection of Supreme Court precedent.

In applying its ultimate questions criterion, the *Africa* court acknowledges that Africa "insists that he has discovered a desirable way to conduct his life," but "does not contend…that his regimen is morally necessary or required." *Africa*, 662 F.2d at 1033. This Circuit has rejected such a principle holding that "[t]he concept of religion embraced by the statute is not, we think, one of an external set of forces and rules that compel an individual to act one way or another." *Jones v. First Kentucky Nat'l Corp.,* No. 84-5067, 1986 WL 398289, *4 (6th Cir. July 17, 1986). The *Jones* court summarized that Jones' "sincerely held religious beliefs may motivate his activity, even though they do not require it." *Id*., at *4. *Jones* based this holding on *Seeger*, 380 U.S. at 186-187, which held that "distinguish[ing] between externally and internally derived beliefs" was "impossible as a practical matter."

The *Africa* court then proceeded to analyze Africa's beliefs noting that "[s]ave for the preoccupation with living in accord with the dictates of nature, MOVE [the group on which Africa based his beliefs] makes no mention of, much less places any emphasis upon, what might be classified as a fundamental concern." *Africa*, supra, at 1033. However, *Seeger* specifically precludes courts from evaluating religious beliefs in this way:

The validity of what [Seeger] believes cannot be questioned. Some theologians … might be tempted to question the existence of the registrant's 'Supreme Being' or the truth of his concepts. But these are inquiries foreclosed to Government … [C]ourts … are not free to reject beliefs because they consider them 'incomprehensible.' Their task is to decide whether the beliefs professed by a registrant are sincerely held and whether they are, in his own scheme of things, religious."
*Seeger*, 380 U.S. at 184-85.

Similarly, the Supreme Court in *Thomas v. Review Bd. of Indiana*

*Employment Sec. Division*, 450 U.S. 707,714 (1981) held that:

The determination of what is a "religious" belief or practice is more often than not a difficult and delicate task, as the division in the Indiana Supreme Court attests. However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.

This principle has been recently applied in the context of Covid-19 policy in

the 9th Circuit Court of Appeals in *Keene v. City and County of San Francisco*,

No. 22-16567, 2023 WL 3451687, *2 (9th Cir., May 15, 2023).

### c) *Africa's* "Comprehensiveness" Criterion.

*Africa*'s and *Fallon*'s criterion of a "comprehensive … belief-system as

opposed to an isolated teaching" also runs afoul of *Seeger*. *Seeger* tells us that its

test for determining whether a belief is religious "is simple of application. It is

essentially an objective one, namely, does the claimed belief occupy the same

place in the life of the [believer] as an orthodox belief in God holds in the life of [the orthodox believer]." *Seeger*, 380 U.S. at 184.

*Seeger* explains that its test "does not distinguish between externally and internally derived beliefs." *Welsh*, 398 U.S. at 399, citing *Seeger*, 380 U.S. at 186. *Seeger* goes on to say that individuals "may not be put to the proof of their religious … beliefs." *Seeger*, at 184. *Seeger* emphasizes that the court or jury's task is limited to determining the believer's sincerity and whether his beliefs are "in his own scheme of things, religious*.*" *Id.*, at 185. *Seeger* adds that "[i]n such an intensely personal area, of course, the claim of the registrant that his belief is an essential part of a religious faith must be given great weight." *Id*., at 184.

In accordance with *Seeger*, other circuit courts have been cautious in questioning the religious nature of a plaintiff's beliefs. *EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de P.R*., 279 F.3d 49, 56 (1st Cir. 2002) (Title VII "thus leaves little room for a party to challenge the religious nature of an employee's professed beliefs."); *EEOC v. Consol. Energy, Inc.,* 860 F.3d 131, 142 (4th Cir. 2017) ("It is not [the employer's] place…nor [theirs] as a court, to question the correctness or even the plausibility of [the plaintiff's] religious understandings."); *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 452 (7th Cir. 2013) ("Title VII has a "broad and intentionally hands-off definition of religion."); *Tagore v. United States*, 735 F. 3d 324, 328 (5th Cir.

29

2013) ("[C]laims of sincere religious belief in a particular practice have been accepted on little more than the plaintiff's credible assertions.").

Africa notes that "MOVE appears to consist of a simple governing idea … philosophical naturalism." *Africa*, 662 F.2d at 1035. *Africa* rejected as insufficiently religious, MOVE members' conviction that they "are practicing [their] religious beliefs all the time." *Id*., at 1035. *Africa* reasoned that "[t]he notion that all of life's activities can be cloaked with religious significance … cannot transform an otherwise secular, one-dimensional philosophy into a comprehensive theological system." *Id*., 1035. This reasoning fails to apply *Seeger*'s principle limiting courts or juries to determining whether a belief is sincere, and whether it is religious in the believer's own scheme of things.

*Africa* also fails to apply the principle of *Welsh* and *Seeger* that religion involves a belief in a Supreme Being that somehow communicates a consciousness of right and wrong action, and the practices based on such beliefs. See *Welsh*, 398 U.S. at 340; *Seeger*, 380 U.S. at 169, 188. It is this principle which provides a distinction between the religious and the secular. A practice based on a belief in God (the Supreme Being) is religious. A belief and practice based on the purely material or worldly is secular. This distinction is found in the consciousness of the believer, not an analysis of the logic of an ideology.

In sum, *Seeger* does not call for an assessment of the logic or validity of the

beliefs, focusing instead on how the beliefs function in the believer's life. Given

that under the *Seeger* test, the beliefs may be intensely personal and need not be

comprehensible to others, there is no basis in Supreme Court precedent for the

*Africa/Fallon* requirement of a third-party assessing whether such beliefs are

comprehensive or systematic.

### d) *Africa's* "Structural Characteristics" Criterion.

*Africa's* and *Fallon's* criterion of formal and external signs is also

inconsistent with Supreme Court precedent. In *Welsh* for example, Welsh's beliefs

formed "by reading in the fields of history and sociology" were sufficient to be

deemed religious. *Welsh*, 398 U.S. at 341. *Welsh* also held that a registrant's

beliefs regarding war "need not be confined in either source or content to

traditional or parochial concepts of religion." *Id*., at 339. *Welsh* did hold that the

"beliefs be held with the strength of traditional religious convictions", but nothing

in *Welsh* justifies *Africa's* requirement that an individual be part of a group

"'structurally analogous' to those 'traditional' organizations that have been

recognized as religions under the first amendment." *Welsh*, 398 U.S. at 340; *Africa*,

662 F.2d at 1036.

 *Seeger* granted a religious exemption to an applicant based on his

"acknowledgement of 'some power manifest in nature … the supreme expression'

that helps man in ordering his life." *Seeger*, 380 U.S. at 187-88. *Welsh* received a

religious exemption based on beliefs formed "by reading in the fields of history

and sociology." *Welsh*, 398 U.S. at 341. *Welsh* explicitly stated that "beliefs that

[support a religious exemption] need not be confined in either source or content to

traditional or parochial concepts of religion. *Id*., at 339. This precludes *Africa*'s

position that a believer must be associated with a group that is "structurally

analogous to 'traditional organizations.'" *Africa*, 662 F.2d at 1036.

> e) ***Fallon*'s Interpretation that Religious Beliefs and Political, Sociological and Philosophic Views are Mutually Exclusive is Contrary to *Seeger* and *Welsh*.**

*Fallon* applies the *Africa* factors to circumstances similar to those in the

present case. *Fallon* asserts that *Seeger* "differentiated between those whose views

were religious in nature and those whose views were 'essentially political,

sociological, or philosophical.'" *Fallon*, 877 F.3d at 490, citing *Seeger*, 380 U.S. at

165. However, *Fallon* ignores *Welsh*'s explanation that those whose views are

"essentially political, sociological or philosophical" are excluded from religious

exemptions only if their beliefs do "not rest at all upon moral, ethical or religious

principle but instead rests solely upon considerations of policy, pragmatism or

expediency." *Welsh*, 398 U.S. at 342-43.

Political, sociological, and philosophical views can be either religious or

secular depending on whether they rest on moral principles based on God (the

Supreme Being) or rest solely on worldly or material realities. The concepts of religion and of politics, sociology and philosophy are not mutually exclusive categories. They overlap to the extent that political, sociological, and philosophical views are aspects of moral action founded on a consciousness of right and wrong somehow conveyed by God (the Supreme Being).

Even *Yoder*'s dicta, which *Fallon* heavily relies on, does not go as far as *Fallon* in drawing the line between the religious and the secular. *Yoder* precludes a religious exemption only "if it is based on ***purely*** secular considerations." *Yoder*, 406 U.S. at 215 (emphasis added.). This formulation contemplates a distinction between beliefs and practices based solely on secular considerations and those based on an admixture of religious and other considerations that could be protected by religious exemptions.

The Supreme Court addresses this point in *Kennedy v. Bremerton School District,* 597 U.S. 507, 524 (2022):

> The [Free Exercise] Clause protects not only the right to harbor religious beliefs inwardly and secretly. It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through "the performance of (or abstention from) physical acts." *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

This principle extends to "the objecting parties' ability to conduct business in accordance with their religious beliefs." *Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682, 686 (2014).

The First Amendment and Title VII protect not only belief but also the right to practice such beliefs in one's daily life, including work activities. Daily activities can include the political, sociological, philosophic, and medical aspects of such activities. *Seeger* and *Welsh* provide that the First Amendment and Title VII do not provide religious protections for those who engage in purely secular activities. However, drawing the line between religious and secular activities requires an assessment of whether one's activities involve moral considerations based on God (the Supreme Being) or solely the material world.

Moral action inherently involves an expression in action of one's awareness of what is right or wrong to do. Ideology and physical practices are the means and conditions of the expression of such awareness. However, moral action cannot be reduced to, or contained in, ideology or formal physical practices. Action involves a purpose, the means to effect such purpose (ideology), and the physical conditions (the material world) of the action. The ordinary public meaning of the term religion as expressed in *Seeger*, *Welsh* and Johnson's dictionary denotes a formation of purpose (which action should be done) founded on consciousness of right or wrong somehow conveyed by God (the Supreme Being).

34

*Fallon*, relying on *Africa*, focuses on the ideological and practical aspects of religion, politics, sociology, and philosophy, but does not attend to the sources for the moral beliefs involved when acting upon such ideas and practices, contrary to *Seeger* and *Welsh*. As *Yoder* acknowledges, this is a "delicate" issue, because it involves assessing an individual's internal state of mind regarding ultimate realities. *Yoder*, 406 U.S. at 215. However, the ordinary public meaning of religion requires such an assessment. *Africa* and *Fallon* reduce this issue to established doctrine and customary practice, which can be aspects, but are not the essence, of the definition of religion.

> **III.    The District Court Erred in Determining that Plaintiff has not Plausibly Pled the Religious Beliefs and Practices and Other Elements of Her Religious Accommodation Claim.**

> **1.   Plaintiff Need Only Plausibly Plead Her Claim, not Establish a Prima Facie Case at the Pleading Stage.**

To survive a motion to dismiss her religious accommodation claim, Prida must plausibly plead that she (1) holds a sincere religious belief or practice that conflicts with an employment requirement, (2) has informed her employer about the conflict, and (3) was terminated because of the conflicting requirement. *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007).

Prida is not required "to establish a prima facie case" as required by the district court's holding. Opinion, R. 16, at p. 6, PageID# 230. "On a motion to dismiss [such requirements] are premature. 'The prima facie case under *McDonnell*

35

*Douglas* … is an evidentiary standard not a pleading requirement.' *Swierkiewecz v. Sorema N.A.,* 534 U.S. 506, 510 (2002). Thus, the ordinary rules for assessing the sufficiency of a complaint apply." *Pedriera*, 579 F.3d 722, 728 (internal quotations omitted). This principle is well-established in this Circuit. See *Savel v. MetroHealth System*, 96 F.4th 932, 2024 WL 1190973, *11 (6th Cir 2024) ("A plaintiff does not have to allege specific facts establishing a prima facie case of discrimination in their complaint.").

Prida needs only to plausibly plead her religious accommodation claim, she is not required to prove her case at the pleading stage. Plausibility "is not akin to a probability requirement, but it also asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). "[W]hen the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but has not 'show[n] – 'that the pleader is entitled to relief.'" *Id.* at 679.

## 2. Plaintiff has Plausibly Pled a Religious Belief or Practice under *Seeger* and *Welsh*.

### a) The Sincerity of Plaintiff's Religious Belief or Practice is not Disputed.

Defendants do not dispute "the sincerity or validity of Plaintiff's alleged religious beliefs and practices in and of themselves." Defendants' Reply Brief, R. 15, PageID# 214. Nonetheless, the district court found that Prida's attempts to

couch secular preferences amongst religious statements did not amount to a "sincerely held religious belief." Opinion, R. 16, p. 11, PageID# 235. This certainly amounts to a determination of the factual issue of sincerity, which has no place in a dismissal at the pleadings stage.

### b) Plaintiff's Belief or Practice is Religious under *Seeger* and *Welsh.*

The district court held there was "no doubt that Prida's refusal to participate in the testing program was motivated - at best – by an isolated moral teaching that incorporates scientific and political factors, not religious belief. Option Care was under no obligation to accommodate Prida's secular beliefs…" Opinion, R. 16, p. 12, PageID# 236. The court also held that Prida's "objections to the testing requirement were not religious in nature" but were instead "essentially medical, 'political, sociological, or philosophical' in nature." *Id*. at p. 10, PageID# 234.

These holdings involve the issue of whether Prida has alleged a belief which in her scheme of things is religious. This issue is a question of fact. The central issue in this appeal, then, is whether Prida plausibly pled that her refusal to take a test with a known carcinogen was based, at least in part, on a belief, which in her scheme of things is religious.

Prida's practice is religious under the ordinary public meaning of the term at the time the First Amendment was adopted if it in any way involves her concept of morality founded on "reverence of God [the Supreme Being]." It is religious under

*Welsh* unless it "rests solely upon considerations of policy, pragmatism, or expediency." *Welsh*, 398 U.S. at 342-43. Under *Seeger*, it is religious unless it was "a moral code which is not only personal, but which is no way related to a Supreme Being." *Seeger*, 380 U.S. at 186.

Prida's belief or practice would be secular only if it is "based on purely secular considerations" as described in *Yoder*'s dicta. *Yoder*, 406 U.S. at 215. To be religious, the belief or practice must be founded, at least in part, on God [the Supreme Being], and to be secular they must be solely founded on material or worldly matters.

*Welsh* explained that "[t]he two groups that obviously do not fall within … the [religious] exemption are those whose beliefs are not deeply held and those whose objection … does not rest at all upon moral, ethical or religious principle but instead rests solely upon considerations of policy, pragmatism, or expediency." *Welsh*, 398 U.S. at 343. *Seeger* explained that these two groups are defined by "whether the beliefs professed by [an individual] are sincerely held and whether they are, in his own scheme of things, religious." *Seeger*, 380 U.S. at 185.

The issue of sincerity is "a question of fact" which is not at issue in the present case as explicitly acknowledged by Defendants. *Seeger*, at 185; Defendants' Reply, R. 15, PageID# 214. But what type of question is the issue of whether beliefs are, in the believer's own scheme of things, religious?

38

*Seeger's* analysis gives guidance on this point. "In such an intensely personal area, of course, the claim of the registrant that his belief is an essential part of a religious faith must be given great weight." *Seeger*, 380 U.S. at 184. This language contemplates the weighing of evidence regarding a factual issue.

Relevant to this case, *Welsh* held that the term religious did not exclude "those who hold strong beliefs about our domestic affairs or even those whose … objection … is founded to a substantial extent upon considerations of public policy." *Welsh*, 398 U.S. at 342. Exclusion from a religious exemption only arises where an "objection … does not rest at all upon moral, ethical, or religious principle but instead rests solely upon considerations of policy, pragmatism, or expediency." *Id*., at 342-43.

Welsh "categorized his beliefs as having been formed "by reading in the fields of history or sociology," and denied that his views were religious. *Welsh*, 398 U.S. at 341. The *Welsh* Court reasoned that "very few registrants are fully aware of the broad scope of the word 'religious' as used in [the Selective Service Act], and accordingly a registrant's statement that his beliefs are nonreligious is a highly unreliable guide…" *Id*.

The Court focused on Welsh's statement that he "believe[d] the taking of life – anyone's life – to be morally wrong." Welsh explained that "I believe that human life is valuable in and of itself … I cannot, therefore conscientiously

39

comply with the government's insistence that I assume duties which I feel are immoral and totally repugnant." *Welsh*, 398 U.S. at 343. *Welsh* held that "[o]n the basis of these beliefs and the conclusion of the Court of Appeals that he held them 'with the strength of more traditional religious convictions' … Welsh was clearly entitled to a [religious] exemption." *Id*.

*Welsh* construed the term "religion" to include the beliefs of someone who denied that they were religious, and who stated that they were based on his reading in the fields of history and sociology. The *Welsh* court noted that Welsh had asserted a strongly held moral belief, that his sincerity was not questioned, and that he did not have to derive his beliefs "from traditional religious convictions." *Id*., at 340, 343. The *Welsh* court acknowledged, but found it unnecessary to parse, the political, sociological, or philosophical dimensions of Welsh's views, and based its grant of a religious exemption on the assertion of a moral belief.

The present case involves a "traditional" religious believer and begs the question of what the substantive definition of the term "religion" is as used in the First Amendment – a question that must be answered to resolve this case. This answer must be found in the ordinary public meaning of religion, which is moral beliefs derived from God [the Supreme Being]. That meaning is consistent with *Seeger* and *Welsh*, which describe religion as involving the Supreme Being communicating a consciousness of right and wrong.

40

Prida's beliefs fall within this definition of religion, as she describes in her December 28, 2021, accommodation request and follow-up emails. Amended Complaint, Doc. 10, PageID# 40; Covid-19 Accommodation Request, Doc 12-1, PageID# 142. As she begins, "I was raised as a Christian. I continue to follow God and his principals [sic] he laid out for us in his word ... I strongly believe that … testing, violates[s] his requirements set forth for us in the Bible." *Id.* She explains further, stating "Do you not know that your body is the temple of the holy spirit within you which you have from God ... by all means glorify God in your body," citing 1 Corinthians 6:19-20. She concludes "that this all relates to what I believe in, how I should care for and what I should do with my temple of God. I cannot in good conscience alter my God given body and will not risk the harm that may come from … the chemicals in the testing." *Id*.

These statements track with Welsh's exemption request stating that he believed the taking of human life to be wrong, and that he could not conscientiously comply with the government's insistence that he assume immoral duties. Accordingly, Prida has alleged a religious belief sufficient to state a religious accommodation claim and easily meets the standard for plausibly pleading a religious belief based on *Seeger* and *Welsh* and the ordinary public meaning of religion in the First Amendment.

41

### c) Defendants' Desire to Avoid Accommodation was a Motivating Factor in its Decision to Discharge Plaintiff.

The district court erred in holding that Prida must plead that "it was the religious aspect of her [conduct] that motivated her employer's actions. *Pedriera v. Ky. Baptist Homes for Child., Inc.*, 579 F.3d 722, 728 (6th Cir. 2009) (quoting *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 627 (6th Cir. 2000)). This is so regardless of whether the plaintiff frames her claim as a discriminatory discharge or a failure to accommodate." Opinion, R. 16, p. 7, PageID# 231. However, *Pedriera* and *Hall* did not involve failure to accommodate claims. In fact, *Hall* specified that the elements of a religious accommodation claim were not relevant to the discriminatory discharge claim that it was addressing. See *Hall*, 215 F.3d at 627-28.

Title VII makes it unlawful for an employer to discharge an individual because of her religious belief or practice unless the employer is unable to reasonably accommodate the belief or practice without undue hardship. Title VII "forbids employers to (1) [discharge] an [individual] (2) 'because of' (3) 'such individual's… [religious practice]'" *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772 (2015). *Abercrombie* held that "Title VII requires otherwise-neutral policies to give way to the need for accommodation." *Id.*, 775.

*Abercrombie* states that "[r]eligious practice is one of the protected characteristics that cannot be accorded disparate treatment." *Abercrombie*, supra, at

42

775. *Abercrombie* explains further that "Title VII does not demand mere neutrality with regard to religious practices – that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers 'not' to fail or refuse to hire or discharge any individual…because of such individual's 'religious observance and practice.'" *Id*. Thus "[i]f the applicant actually requires an accommodation of [her] religious practice, and the employer's desire to avoid the prospective accommodation is a motivating factor in his decision, the employer violates Title VII." *Id*., at 773-774. It is the motive to avoid the accommodation that triggers Title VII liability, not a motive to discriminate against the religious aspect of Prida's conduct.

Prida alleges that Defendants refused to discuss religious accommodation to weekly Covid testing with Ethylene Oxide, stating that they were not offering alternative testing options. Amended Complaint, R. 10 at ¶¶49-57, 58, PageID# 100-102. This is sufficient to plausibly plead that Defendants' desire to avoid the accommodation was a motivating factor in their decision.

### d) Plaintiff's Religious Belief or Practice is One But-For Cause of Her Discharge.

The district court, following *Africa* and *Fallon*, held that "Prida alleges largely secular beliefs … not religious belief." Opinion, R. 16, at p. 12, PageID# 236 (Emphasis added). The district court's use of the word "largely" acknowledges that Prida's beliefs were, in the court's view, to some extent religious, which

passes under *Welsh*, *Seeger*, and *Bostock*, 590 U.S. 644. See Opinion, R. 16, at p. 12, PageID# 236.

The district court measured Prida's practice as partly secular and partly religious. Regardless of the validity of such measurement, if Prida's practice is religious to any extent, Defendants may not discharge her "because of" such practice. Title VII's term "'because of' …imports, at a minimum, the traditional standard of but-for causation." *Abercrombie*, 575 U.S. at 772. "When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision. So long as the plaintiff's [protected trait] was one but-for cause of that decision, that is enough to trigger the law." *Bostock*, 590 U.S. at 656.

To trigger liability under Title VII's but-for causation standard defined in *Bostock*, Prida's religious practice need not be the sole or even main cause or factor in Defendants' action, so long as it is one but-for cause of the action. *Bostock*, 590 U.S. at 655-57, 664-67. Accordingly, at the pleadings stage, Prida need only plausibly plead that her religious practice was one but-for cause of Defendants' employment action. As explained in *Bostock*, but-for causation is a "path to relief under Title VII" that is separate and distinct from the path to relief

44

afforded by the motivating factor test. *Id.*, at 657. Prida need only plausibly plead that one but-for cause of her discharge was her religious practice.

Prida pled that she could not "in good conscience alter [her] God given body and will not risk the harm that may come from the chemicals in the testing," and as a result refused to submit to the testing and was discharged. Amended Complaint, R. 10 at ¶45, PageID# 100. This is sufficient to plausibly plead that her religious practice was one but-for cause of her termination.

### 3. Even Though the *Africa/Fallon* Pleading Standard is Not Applicable, it Has Been Met in the Present Case.

Although she is not required to do so, Prida has plausibly plead a religious belief and practice sufficient to state a religious accommodation claim under the *Africa/Fallon* test. The district court dismissed Prida's claim on the grounds that her beliefs were "essentially political, sociological, or philosophic views," citing *Lawhead*'s quote of *Fallon*. The court dismissed Prida's belief "that her body is God's temple" as "attempts to couch secular preferences amongst generic religious statements [that] do not amount to a sincerely held religious belief." Opinion, R. 16, p. 11, PageID# 235.

Prida's belief is much more meaningful than the district court gives it credit. Prida states that the Bible provides that her "body is the temple of the holy spirit within [her] which she has from God." This is a reference to Jesus' statement that "I have much more to say to you, more than you can now bear. But when he, the

45

Spirit of truth, comes, he will guide you into all truth." John 16: 12-13. John

further explained elsewhere that Jesus "came from the Father, full of grace and

truth" and that "[t]hrough him all things were made." John 1: 3,14.

The district court focused on Prida's statement that her body is God's temple

but did not mention the full quote that it is the temple of the Holy Spirit. This omits

a key point that Prida was trying to explain. She is being guided by the Holy Spirit

to understand the truth about all things that were made. A truth that Jesus explained

that he could not convey because of our limitations, but that the Holy Spirit would

guide us into.

The truth involves not only awareness of all things, but also awareness of

how we are to act in relation to all things. Elsewhere, Jesus explained that he is the

Truth (John 14:6) and that "he can do only what he sees his Father doing." John

5:19. The truth includes not only the creation of all things, but also the ordering of

our actions regarding such things based on the Father's will.

Prida's allegations must be placed in the Biblical context she references in

her complaint. It is not necessary for her to provide all the details of her Biblical

worldview in order to plausibly state a religious accommodation claim. Her beliefs

easily meet the *Seeger/Welsh* test for religious beliefs. While not necessary, she

also meets the *Africa/Fallon* test for religious beliefs regarding ultimate questions,

46

comprehensiveness, and structural considerations given her grounding in the Biblical context.

Prida has pleaded that her refusal to apply a carcinogenic chemical in testing on her body involves moral actions founded on reverence of God and therefore has plausibly pled a religious accommodation claim under either the *Seeger*/*Welsh* test or the *Africa*/*Fallon* test.

### IV. The District Court Erred in Determining that Plaintiff has not Plausibly Pled the Oppositional Practice and Causation Elements of her Retaliation Claim.

The district court erred in dismissing Prida's retaliation claim for failing to plead a *prima facie* case with respect to the elements of her engagement in a protected activity and a causal connection between her protected activity and her employer's adverse action. However, Prida is not required to plead a *prima facie* retaliation case at the pleadings stage, she need only plausibly plead such a claim. *Savel v. MetroHealth System*, 96 F. 4th 932, 2024 WL 1190973, *11 (6th Cir 2024).

"[O]pposing any practice that the employee reasonably believes to be a violation of Title VII" is protected activity. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000). Prida was initially told by Defendants that her request for accommodation from the testing requirement was approved on February 17, 2022. Amended Complaint, R. 10, ¶ 42, PageID# 99. On February 22,

2022, Defendants informed Prida that she was required to undergo weekly testing without addressing her request for accommodation from such testing. *Id*., ¶43. On February 25, 2022, Prida responded that she could not engage in the testing, which used Ethylene Oxide, due to her religious beliefs. *Id*., at ¶45, PageID# 100. On March 1, 2022, Prida sent notarized affidavits with attached evidentiary exhibits to several of Defendants' representatives protesting the unlawful weekly covid testing policies and the violation of her privacy rights. Id., at ¶ 51, PageID# 101. On March 2, 2022, Prida gave these affidavits to Defendants' representatives. Id., at ¶ 54, PageID# 101-2. The affidavits specifically allege violations of Title VII. Prida Opposition Brief Ex. 1, R. 14-1 at pp. 6, 16, PageID# 197, 207. These allegations are sufficient to plausibly plead the element of oppositional protected activity.

The remaining element of causation is not "onerous" even at the "prima facie stage" and "can be met through 'evidence that defendant treated the plaintiff differently from similarly situated employees or that the action was taken shortly after the plaintiff's exercise of protected rights." *George v. Youngstown State University*, 966 F. 3d 446, 460 (6th Cir. 2020). "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Id.*

48

Prida was terminated on March 9, 2023, shortly after her oppositional protected activity, and alleged that other employees in her department received accommodations from testing. Amended Complaint, R. 10, ¶¶14, 63, PageID# 93, 103-4. These allegations are sufficient to plausibly plead the causation element of Prida's retaliation claim.

### V.    The District Court Erred by Dismissing Plaintiff's O.R.C. §4112.02 Claim *Sua Sponte* on Grounds not Raised by Defendants.

Defendants moved for dismissal of Prida's O.R.C. §4112.02 claim on the grounds that her objections to testing were based on secular, not religious, beliefs. The district court's error on this point is addressed above. However, the district court also *sua sponte* dismissed her O.R.C. §4112.02 claim on the merits on the grounds that Prida did not plausibly plead that she was "treated differently than similarly situated employees," an argument not raised in the dismissal motion briefing. Opinion, R. 16, p. 17, PageID# 241.

Before a *sua sponte* dismissal a district court must, among other things "notify all parties of its intent to dismiss the complaint…[and] give the plaintiff a chance to either amend his complaint or respond to the reasons stated by the district court in its notice of intended *sua sponte* dismissal…" *Doe v. Oberlin College,* 60 F.4th 345, 351 (2023)  The district court erred by failing to meet these requirements in this case for Prida's O.R.C. §4112.02 claim.

49

Moreover, the district court erred in requiring Prida to establish a *prima facie* case for the R.C. §4112.02 claim at the pleading stage contrary to *Swierkiewicz*, supra, as discussed above. The district court noted that Prida pled that four other employees in Prida's work section received accommodations or exemptions from the testing requirement but ruled that she did not plead sufficient evidentiary details. Opinion, R. 16, p. 17, PageID# 241. Prida's allegations are sufficient to raise a right to relief above the speculative level and therefore she has plausibly pled her claim. *Kassa v. Detroit Metro Convention & Visitors Bureau*, 672 Fed. Appx. 575 (6th Cir. 2017). Even if Prida had not sufficiently stated her claim, she would be entitled to amend this claim prior to dismissal under *Doe v. Oberlin College*, supra.

## CONCLUSION

For the above reasons the district court's judgment dismissing the subject case should be reversed and the case should be remanded for further proceedings in accordance with law.

Respectfully submitted,

/s/ *Thomas W. Connors*
Thomas W. Connors (0007226)
Warner Mendenhall (0070165)
Brian Unger (0096884)
MENDENHALL LAW GROUP
190 North Union Street, Suite 201
Akron, Ohio 44304
(330) 535-9160
tconnors@warnermendenhall.com
warner@warnermendenhall.com
brian@warnermendenhall.com

*Attorneys for Plaintiff-Appellant*
*Leah Prida*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,088 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

*/s/ Thomas W. Connors*
Thomas W. Connors
Attorney for Plaintiff-Appellant

## CERTIFICATE OF SERVICE

I, Thomas W. Connors, counsel for Plaintiff-Appellant and a member of the Bar of this court, certify that, on May 1, 2024, a copy of the Brief of Plaintiff-Appellant was filed electronically through the appellate CM/ECF system with the Clerk of the Court. I further certify that all parties required to be served have been served.

*/s/ Thomas W. Connors*
Thomas W. Connors
Attorney for Plaintiff-Appellant

**DESIGNATION OF DISTRICT COURT DOCUMENTS**
*Leah Prida v. Option Care Enterprises, et al.,*
No. 5:23-cv-00905

| Docket Entry No. | Description | PageID# |
|---|---|---|
| 10 | Amended Complaint | 91-107 |
| 12 | Defendant's Motion to Dismiss Amended Complaint | 111-138 |
| 12-1 | Exhibit 1 to Motion to Dismiss Amended Complaint | 139-142 |
| 12-2 | Exhibit 2 to Motion to Dismiss Amended Complaint | 143-145 |
| 12-3 | Exhibit 3 to Motion to Dismiss Amended Complaint | 146-147 |
| 13 | Answer to Amended Complaint | 148-165 |
| 14 | Plaintiff's Brief in Opposition to Motion to Dismiss Amended Complaint | 166-191 |
| 14-1 | Exhibit 1 to Brief in Opposition to Motion to Dismiss Amended Complaint | 192-210 |
| 15 | Defendant's Reply Brief in Support of Motion to Dismiss Amended Complaint | 211-224 |
| 16 | Memorandum Opinion and Order Dismissing Case | 225-243 |
| 17 | Judgment Entry of Dismissal | 244 |