No. 23-3936

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**LEAH PRIDA,**

        Plaintiff-Appellant,

  -vs.-

**OPTION CARE ENTERPRISES, INC., et al.,**

        Defendants-Appellees.

On Appeal from the United States District Court for the Northern District of Ohio
(No. 5:23-cv-00905)

---

## REPLY BRIEF OF PLAINTIFF-APPELLANT

---

Thomas W. Connors (0007226)
Warner Mendenhall (0070165)
Brian Unger (0096884)
MENDENHALL LAW GROUP
190 North Union Street, Suite 201
Akron, Ohio 44304
(330) 535-9160
tconnors@warnermendenhall.com
warner@warnermendenhall.com
brian@warnermendenhall.com

*Attorneys for Plaintiff-Appellant*
*Leah Prida*

## **<u>TABLE OF CONTENTS</u>**

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES........................................................ iii

ARGUMENT.............................................................................1

    I.    *Lucky* Limits the Issues in this Case....................................1

    II.   *Lucky* Does Not Address the Line Between the Secular and the Religious. ..........................................................................7

    III.  Assessing a Claimed Religious Belief as Secular is Questioning the Validity of the Religious Belief and Determines a Factual Issue.....13

    IV.  Prida Plausibly Plead the Oppositional Practice and Causation Elements of her Retaliation Claim....................................16

       A. The Oppositional Practice..................................................16

       B. Causation. ........................................................................17

       C. Exhaustion of Administrative Remedies. .........................17

    V.   The District Court's Sua Sponte Dismissal of Plaintiff's O.R.C. §4112.02 Claim for Disparate Treatment Based on a Failure to Accommodate Reflects a Misunderstanding of the Claim. .............19

CONCLUSION...........................................................................22

CERTIFICATE OF COMPLIANCE ...........................................24

CERTIFICATE OF SERVICE....................................................24

## TABLE OF AUTHORITIES

CASES

*Africa v Com. Of Pa.,* 662 F.2d 1025 (3rd Cir. 1981) ............................. 8, 9, 10, 11

*Benzaoual v. Ohiohealth Corp.,* No. 2:19-cv-3366, 2021 WL 2712174 (S.D. Ohio

 July 1, 2021) ...................................................................................18

*Bostock v. Clayton County, Georgia,* 590 U.S. 644 (2020) .......................................4

*Coles v. Johnny Appleseed Broadcasting Company,* 479 F. Supp. 3d 585 (N.D.

 Ohio 2020) .......................................................................................21

*Curtis v. Loether,* 415 U.S. 189, 194 (1974) ........................................................16

*Davis v. Sodexho,* 157 F.3d 460 (6th Cir.1998)." ...................................................18

*Does 1-11 v. Board of Regents of University of Colorado,* 100 F.4th 1251 (10th

 Cir. 2024). .............................................................................. 5, 6, 7

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc.,* 575 U.S. 768  (2015)............. passim

*Edelstein v. Stephens,* Case No. 1:17cv305, 2020 WL 1846745 (S.D. Ohio), ........21

*Employment Div. v. Smith,* 494 U.S. 872 (1990). .....................................................2

*Fallon v. Mercy Catholic Medical Center of Southeastern Pennsylvania,* 877 F.3d

 487 (3rd Cir. 2017) ................................................................................8

*Frazee v. Illinois Dept. of Employment Sec.,* 489 U.S. 829 (1989) ................. 3, 5, 7

*George v. Youngstown State University,* 966 F.3d 446 (6th Cir. 2020); ................17

*Jones v.First Kentucky Nat'l Corp.,* No. 84-5067, 1986 WL 398289, *4 (6th Cir.).3,

 5, 7

*Keene v. City and County of San Francisco*, No. 22-16567, 2023 WL 3451687 (9th
Cir., May 15, 2023) ........................................................................ 14, 15

*Little Forest Med. Ctr. Of Akron v. Ohio Civil Rights Comm'n*, 61 Ohio St. 3d 607
(1991). ...............................................................................................21

*Lucky v. Landmark Medical of Michigan, P.C.,* 103 F.4th 1241 (6th Cir. 2024)
........................................................................................... passim

*Randolph v. Ohio Dep't of Youth Servs.,* 453 F.3d 724 (6th Cir.2006). .................18

*Ringhofer v. Mayo Clinic, Ambulance*, 102 F.4th 894 (8th Cir. 2024) ....................4

*Thomas v. Review Bd. of Indiana Employment Sec. Division*, 450 U.S. 707 (1981),
........................................................................................ 13, 14, 15

*U.S. v. Seeger,* 380 U.S. 163 (1965) ............................................... passim

*Welsh v. U.S.,* 398 U.S. 333 (1970) ............................................... passim

*Wisconsin v. Yoder*, 406 U.S. 205 (1972). ....................................... 10, 11

*Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359 (6th Cir. 2010). ..........................18

STATUTES
O.R.C. §4112.02 ....................................................................... 19, 21

OTHER AUTHORITIES
2 S. Johnson, A Dictionary of the English Language (1755) ................ 9, 10, 11, 12

iv

## ARGUMENT

### I.   *Lucky* Limits the Issues in this Case.

This Court's recent decision in *Lucky v. Landmark Medical of Michigan, P.C.,* 103 F.4th 1241 (6th Cir. 2024) significantly limits the issues presented in this case.  As in *Lucky*, most of the allegations requisite to Prida's religious accommodation claim are undisputed: she has sincere beliefs and practice that conflict with an employment requirement; she informed her employer about the conflict; her employer refused to offer her an accommodation; and she was terminated because of the conflicting requirement.  *Id*., at 1243.  The sole issue is whether Prida's alleged beliefs and practices are religious within the meaning of Title VII and the First Amendment.

Prida explained her beliefs regarding Covid-19 testing in her accommodation request as follows:

> I was raised as a Christian. I continue to follow God and his principals [sic] he laid out for us in his word ... I strongly believe that … testing, violates[s] his requirements set forth for us in the Bible."  … Do you not know that your body is the temple of the holy spirit within you which you have from God ... by all means glorify God in your body [citing 1 Corinthians 6:19-20] … this all relates to what I believe in, how I should care for and what I should do with my temple of God. I cannot in good conscience alter my God given body and will not risk the harm that may come from … the chemicals in the testing."

> Amended Complaint, R. 10, PageID#40; Prida's Accommodation Request, R. 12-1, PageID#142.

1

As to general pleading requirements, *Lucky* makes clear that Prida need only plausibly allege her religious claim and does not need "to establish a prima facie case" at the pleading stage as required by the district court. *Id.*, at 1244. *Lucky* also emphasizes that "courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim." *Id.*, at 1243. Since the district court may not question the plausibility of Prida's religious claim it would be axiomatic that it could not dismiss her religious claims for lack of plausibility.

As to the factual allegations necessary to state a religious claim, *Lucky* held that when Prida alleges that her refusal to comply with the conflicting testing requirement was an "aspect" of her religious belief or practices she does not need to "explain how 'her religion has a specific tenet or principle that does not permit her'" to comply with the required testing. *Lucky*, 103 F.4th 1241, 1243. There is no such pleading requirement because "it is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'" *Id.*, at 1244, citing *Employment Div. v. Smith*, 494 U.S. 872, 887 (1990).

The twofold test for determining what beliefs are religious is set forth by *U.S. v. Seeger,* 380 U.S. 163, 185 (1965) and *Welsh v. U.S.,* 398 U.S. 333, 339 (1970): "[W]hether the beliefs professed by [an applicant] are sincerely held and

whether they are, in his own scheme of things, religious." Option Care admits both elements of this test when it states that it "has not and does not question the validity or sincerity of [Prida's] religious beliefs and practices in general." Response Brief, R. 21, PageID # 22. This should resolve the issue of whether Prida's alleged beliefs and practices are religious as a matter of law.

Nonetheless, Option Care argues, and the district court ruled that despite Prida's allegations, her beliefs and practices were not in fact religious, because they were secular. Option Care contends that *Lucky* is factually distinguishable because Lucky alleged that her religious beliefs, prayer and faith in God, not any secular or non-religious beliefs, **precluded** vaccination. But the argument that religious exemptions are only available for activities which are precluded by "a specific tenet" of a religious faith was rejected by *Lucky*. This is consistent with long-standing case law. *Frazee v. Illinois Dept. of Employment Sec.*, 489 U.S. 829, 833-834 (1989) ("Never did we suggest that unless a claimant belongs to a sect that forbids what his job requires, his belief, however sincere, must be deemed a purely personal preference rather than a religious belief." […] "[W]e reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization."); *Jones v. First Kentucky Nat'l Corp.,* No. 84-5067, 1986 WL 398289 (6th Cir.) ("[S]incerely held beliefs may motivate his activity even though they do not require it.").

3

Option Care's argument that Prida's refusal to test must not be based on "any secular nonreligious beliefs" does not fare any better, given *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 656 (2020) ("[W]here it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision.  So long as the plaintiff's [protected trait] was one but-for cause of that decision, that is enough to trigger the law.").  Further, Option Care can incur Title VII liability under a separate "path to relief" afforded by the "'motivating factor'…standard" which "can sometimes follow even if [the protected trait] *wasn't* a but-for cause of the employer's challenged decision."  *Id*., at 657.

Option Care is left with the argument that *Lucky* is distinguishable because Lucky alleged that she prayed to God, who told her not to take the vaccine.  Given that Prida has alleged that she strongly believes that testing violates God's principles set forth in the Bible, this is a distinction without a difference.

The Eighth Circuit in *Ringhofer v. Mayo Clinic, Ambulance*, 102 F.4th 894 (8th Cir. 2024)  reaches the same result as *Lucky*, on facts almost identical to the present case.  Ringhofer objected to Covid-19 testing because "her body is a temple for the Holy Spirit," and "it violates her conscience…to engage in weekly testing."  *Id*  at 902.  Option Care argues that *Ringhofer* is distinguishable because

"the Ringhofer plaintiffs alleged that their specific religious objections prohibited them from submitting to Covid testing."  Brief of Appellee, Doc. 21, Page 49. However, as discussed above, the Supreme Court in *Frazee* and this Circuit in *Jones,* clearly rejected that argument.

The Tenth Circuit also reached a similar result in *Does 1-11 v. Board of Regents of University of Colorado*, 100 F.4th 1251 (10th Cir. 2024).  *Does* explained that regardless of the applicability of the First Amendment, an "employer … must still provide religious accommodations under Title VII."  *Id*., at 1280. *Does* addressed a University of Colorado ("Colorado") Covid-19 policy that "would only accept requests for religious exemption that cite to the official doctrine of an organized religion…"  *Id*., at 1257.  Colorado "rejected any application for a religious exemption unless the applicant could convince the Administration that her religion 'teaches [her] and all other adherents that immunizations are forbidden under all circumstances.'"  *Id*., at 1257.  For example, the Administration decided that "it is 'morally acceptable' for Roman Catholics to take vaccines against Covid-19," and that any Roman Catholic objections to the Covid-19 vaccine are "personal beliefs" not "religious beliefs." *Id*., at 1258.

*Does* rejected the dissent's argument that Colorado "adopted the [vaccine] mandate…to protect the health and safety of its staff, students and patients…not to 'suppress religion.'"  *Id*., at 1280. *Does* explained that Colorado's motive for the

5

mandate was not relevant, instead "what matters is how – and why – the Administration implemented the religious accommodations required by Title VII." *Id*., at 1280.

Does held that Colorado had "implemented a policy of granting exemptions for some religions but not others." *Id.,* at 1269. *Does* noted that under this policy "[a]n applicant whose religious beliefs departed from the 'official doctrine' of their religion would not qualify." *Id*., at 1269. *Does* concluded that Colorado "rejected applicants' beliefs based not on their sincerity, but rather on their perceived validity." *Id.,* at 1271. *Does* held that Colorado's policy "falls far below the requirements of Title VII, denying its protections to the vast majority of religious believers, and providing such benefits only to a select few with favored religious beliefs." *Id.,* at 1280.

*Does* is an application of the *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.,* 575 U.S. 768, 775 (2015) principle that "Title VII requires otherwise-neutral policies to give way to the need for accommodation." As *Abercrombie* provides, "if …the employer's desire to avoid the prospective accommodation is a motivating factor in his decision, the employer violates Title VII." *Id.,* at 773-774. Absence of animus towards religion is irrelevant to a Title VII religious accommodation claim, it is the motive to avoid an accommodation that renders an employer liable under Title VII.

Not only does *Does* reject the district court's and Option Care's position that an applicant's religion must prohibit the challenged activity, it goes further and cites an employer's reliance on such an argument as showing motivation to avoid religious accommodation in violation of Title VII. *Id.,* at 1280. *Does*' reasoning is based on the legal principle that a belief may still be religious even if it is not based on a mandatory teaching of an organized religion as reflected in *Frazee* and *Jones.* As a result, when an employer denies a religious accommodation to such a believer, its action reflects a motive to avoid a religious accommodation.

## II.    *Lucky* Does Not Address the Line Between the Secular and the Religious.

Unlike *Lucky*, the district court's decision in this case was not limited to the reasoning that Prida's beliefs were not formal tenets of her religion. The district court also determined that Prida's refusal to receive testing was based on beliefs that were secular, and not religious.

In *Lucky*, this court determined that "Lucky's allegations were almost self-evidently enough to establish, at the pleadings stage, that her refusal to receive the vaccine was an 'aspect' of her religious observance or belief." *Lucky*, 103 F.4th at 1243. In other words, *Lucky's* alleged beliefs regarding receiving the vaccine were obviously religious and no further explanation was needed for the district court to conduct proceedings on remand consistent with this court's opinion.

7

In the present case, however, the line between the secular and the religious is not obvious to the district court given the *Africa v. Com. Of Pa.,* 662 F.2d 1025 (3rd Cir. 1981) and *Fallon v. Mercy Catholic Medical Center of Southeastern Pennsylvania*, 877 F.3d 487 (3rd Cir. 2017) line of cases relied upon by that court. An explanation of the reasons for this court's decision is needed to ensure that any remand proceedings that may be ordered are consistent with this court's decision.

Prida's accommodation request specified that the Covid-19 "testing violate[s] [God's] requirements set forth for us in the Bible," described those biblical requirements regarding her body being the temple of the Holy Spirit, and concluded that as a result she could not "in good conscience…risk the harm that may come from…the chemicals in the testing."  Prida's Accommodation Request, R. 12-1, PageID#142; Amended Complaint, R. 12-1, ¶40, PageID#98. Nonetheless, the district court found that "the record in this case does not reflect that Prida ever raised a religious objection to the testing program at all."  Opinion, R. 16, PageID#234.

The district court found that "Prida's objections to the testing requirement were not religious in nature," but instead were "essentially medical, 'political, sociological, or philosophical in nature…"  Opinion, R. 16, PageID#234.  The court concluded that "Prida alleges largely secular beliefs in an attempt to procure a 'blanket privilege and a limitless exclude for avoiding all unwanted obligation."

8

Opinion, R. 16, PageID#236.  The court specified that "Prida's alleged religious belief that her body is 'God's temple' would, if allowed, grant the plaintiff carte blanche to accept or reject nearly any condition of her employment."  Opinion, Doc. 16, PageID#235.

The district court's ruling is based on an unexplained distinction between the religious and the secular that the court apparently considers so obvious that it requires no further explanation.  Further, the court assumes that anything that can be characterized as medical, political, sociological or philosophical falls into the category of the secular and cannot be characterized in any way as religious. However, given that the distinction between the secular and the religious is so central to this case, it should be explained in some way.  This, of course, is the function of defining terms, which is basic to the task of legal interpretation of statutory or constitutional terms.

Option Care argues that the definition of religion reflected in *Seeger* /*Welsh* and  Johnson's  dictionary (2 S. Johnson, A Dictionary of the English Language (1755)) is abstract, academic and antiquated.  Option Care sees the definition of religion from *Africa*/*Fallon*, on the other hand, as more holistic and modern.  The Supreme Court, however, has been very clear that the test for defining legal terms is the ordinary public meaning of such terms at the time of their enactment into law.

9

*Africa* acknowledges that '[t]he Supreme Court has never announced a comprehensive definition of religion" and offers a "modern analysis," which "consists of a 'definition by analogy' approach" that is described as "a refinement and an extension of the 'parallel'-belief course first charged by the Supreme Court in Seeger." *Africa*, 662 F.2d at 1030-1031.

In essence, *Africa* defines religion as comprehensive doctrines regarding ultimate questions, which are accompanied by formal structural characteristics. *Id*., at 1033-1036. By contrast *Seeger /Welsh* and Johnson's dictionary defines religion as moral goodness based on a Supreme Being that somehow conveys an understanding of right and wrong.

*Africa* defines institutional religion, which while certainly an example of religion, is not the essence of religion as defined by *Seeger /Welsh* and Johnson's dictionary. *Africa* justifies its effort to limit the scope of the definition of religion on the grounds that "the very concept of ordered liberty precludes allowing…any…person…a blanket privilege 'to make his own standards on matters of conduct in which society as a whole has important interests.'" *Africa*, at 1031, citing *Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972).

*Yoder*'s observation was clearly dicta given that the religious nature of the challenged activity of the Amish was never disputed in that case. *Yoder* did not analyze the definitional basis for the line between the secular and the religious

10

because the case before it did not require that.  Moreover, *Yoder*'s dicta was only making the point that the First Amendment did not provide a barrier to "reasonable state regulation of [a way of life] …if it is based on ***purely*** secular considerations." *Id.*, at 215 (Emphasis added.)  (This distinction is consistent with *Seeger's* ruling precluding religious exemptions for personal beliefs that are "in no way related to a Supreme Being." *Seeger*, at 186.).  In this dicta, *Yoder* was not addressing the barrier to state regulation of ways of life based in part or in whole on religious considerations.  *Yoder* did not address the distinctions drawn by *Seeger /Welsh* and Johnson's dictionary regarding the definition of religion.

The crux of the matter is that *Africa*'s effort to limit the definition of religion to institutional religions is clearly contrary to Supreme Court precedent reflected in *Seeger /Welsh* and the ordinary public meaning of religion reflected in Johnson's dictionary.  The essence of religion is the believer's understanding of right and wrong somehow conveyed by God or the Supreme Being or the Supreme Reality.  It is more than an idea or a practice, it is an idea or a practice characterized as right or wrong based on a higher immaterial authority.  That is a relationship with what is often described as a spiritual reality.

This is a very difficult concept to convey to a purely secular mindset, which by definition does not recognize the spiritual as a form of reality.  To the purely secular mindset, the only factors encompassed by the definition of religion, which

11

can be characterized as real, are ideas and practices, not the relationship with spiritual authority upon which a religious believer's understanding of right and wrong are based.

The *Seeger/Welsh/*Johnson definition of religion provides a basis for addressing the line drawn by the district court between the medical/political/sociological/philosophical and the religious. The district court deems the medical as purely secular, and therefore categorically distinct from the religious. However, the medical involves both ideas and practices, which may be assessed as right or wrong. To the extent that such ideas and practices are assessed as right or good based on a belief in a Supreme Being that somehow conveys an understanding of right and wrong, they are religious within the meaning of the *Seeger*/*Welsh*/Johnson definition. It is only if medical ideas and practices are deemed right or wrong based solely on the material or the worldly that they may be assessed as purely secular.

The *Seeger*/W*elsh*/Johnson definition is rejected by the district court as an attempt to procure a blanket privilege to avoid all unwanted obligation. This is plainly incorrect given that a religious accommodation is only available if it does not present an undue hardship. But more deeply, this is a policy argument not a legal argument. This policy was set by the framers of the First Amendment and adopted by the drafters of Title VII.

12

### III.    Assessing a Claimed Religious Belief as Secular is Questioning the Validity of the Religious Belief and Determines a Factual Issue.

The district court's ruling is inconsistent with *Seeger/Welsh*'s broad standard for religious exemptions, and their principle that the courts cannot judge the validity of religious beliefs.  *Seeger*, 380 U.S. at 184-85 ("The validity of what [Seeger] believes cannot be questioned.  Some…might be tempted to question the existence of the registrant's 'Supreme Being' or the truth of his concepts.  But these are inquiries foreclosed to Government…").

*Seeger* states that "the claim of a registrant that his belief is an essential part of a religious faith must be given great weight," and clarifies that this relates to the sincerity, not the validity, of the belief.  *Id*., at 185-85 (stating further, "But we hasten to emphasize that while the 'truth' of a belief is not open to question, there remains the significant question whether it is 'truly held.'  This is the threshold question of sincerity which must be resolved in every case.  It is, of course, a question of fact…").

The test for the validity of religious beliefs is "whether they are in the [believer's] own scheme of things, religious." *Id.,* at 185.  The Supreme Court addressed this issue in *Thomas v. Review Bd. of Indiana Employment Sec. Division*, 450 U.S. 707, 714 (1981), where the lower court, like the district court in this case, held that "Thomas has made a merely 'personal philosophical choice rather than a religious one.'"  *Thomas* reversed this ruling, stating:

13

The determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task…However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection. *Id*., at 714.

The district court clearly questioned the validity of Prida's alleged religious beliefs stating that "…Prida's request for accommodation attempts to dress up an isolated moral teaching using biblical quotes and spiritual language…The pleaded facts… leave no doubt, that Prida's refusal to participate in the testing program was motivated-at best-by an isolated moral teaching that incorporated scientific and political factors, not religious belief." Opinion, R. 16, PageID#236.

The district court's ruling directly contradicts *Thomas'* admonition that "[c]ourts are not arbiters of scriptural interpretation," and its specific instruction that "religious beliefs need not be acceptable, logical, consistent or comprehensible to others." *Id.,* at 617. *Thomas* rejected the argument that a court could conduct such an inquiry by characterizing Thomas' views as philosophical, like the district court's characterization of Prida's views as "…essentially medical, 'political, sociological, or philosophical.'" Opinion, R. 16, PageID#234.

*Thomas* was applied by *Keene v. City and County of San Francisco*, No. 22-16567, 2023 WL 3451687 (9th Cir., May 15, 2023) in the context of a religious accommodation claim relating to a Covid-19 vaccine mandate. In *Keene*, the Ninth Circuit reversed the lower court's determination that plaintiffs "had not

14

asserted sincere religious beliefs because their beliefs were not scientifically accurate." *Id*., at *2. *Keene* explained that "[a] religious belief need not be consistent or rational to be protected under Title VII and an assertion of a sincere religious belief is generally accepted." *Id.*, at *2, citing *Thomas*, at 714. *Thomas* and *Keene* provide, contrary to the district court, that assessment of the validity of Prida's religious beliefs, is not contingent on the scientific factors incorporated into her beliefs, whether accurate or not.

*Seeger/Welsh* did draw a line between the religious and the secular which arguably presents a factual issue, which these cases preclude the Government from addressing. That line is the distinction between whether a believer's sense of right and wrong is somehow conveyed by God or is based purely on the material or the worldly. This distinction is different from the factual issue of sincerity but is similar in the sense that it involves the consciousness of the believer. Making this distinction requires an assessment of a state of mind involving the believer's relationship with God. Seeger clearly barred the courts from making the assessment necessary for this factual distinction. *Seeger*, 380 U.S. at 184 ("The validity of what [Seeger] believes cannot be questioned [because] these are inquiries foreclosed to Government.").

The district court's approach is an end-run effort that crosses this red line. Characterizing Prida's alleged religious beliefs as secular and not religious, is still

15

an assessment of a claimed religious belief and therefore involves an inquiry
foreclosed to Government.

Even if such an inquiry was not foreclosed to Government, it would still
involve a factual issue like the issue of sincerity, which would be a fact issue for a
jury.  Validity, like sincerity, involves determining the state of mind of the holder
of the alleged beliefs.  Such a determination would require an assessment of
whether the believer is basing her belief on God or on the worldly and would
therefore be a fact issue for a jury. See *Curtis v. Loether*, 415 U.S. 189, 194 (1974)
(stating, "The Seventh Amendment does apply to actions enforcing statutory
rights, and requires a jury trial upon demand, if the statute creates legal rights and
remedies, enforceable in an action for damages in the ordinary courts of law.")

### IV.    Prida Plausibly Plead the Oppositional Practice and Causation Elements of her Retaliation Claim.

#### A. The Oppositional Practice.

Option Care admits that Prida protested the legality of the testing policy on
March 1, 2022.  Appellee's Brief, Doc. 21, Page 51, citing Amended Complaint, R.
10, PageID#101, ¶51.  Paragraphs 51 and 55 allege that Prida gave Option Care
two affidavits that she had signed "protesting Option Care's unlawful weekly covid
testing policies."  These affidavits opposed Option Care's Covid-19 testing
mandate (Prida's Affidavits, R. 14-1, PageID#192, 201-02, 207-08) and specified
that Option Care was thereby violating Title VII.  Prida's Affidavits, R. 14-1,

16

PageID#197, 207.  Option Care's argument that Prida's affidavits made "no reference to Title VII" is simply incorrect.  Appellee's Brief, Doc. 21, Page 51. Option Care has therefore plausibly pled an oppositional practice to Option Care's Covid-19 testing mandate.

### B. Causation.

Option Care does not dispute that "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *George v. Youngstown State University*, 966 F.3d 446, 460 (6th Cir. 2020);  Appellant's Brief, Doc. 19, Page 55.  For pleading purposes, Prida does not need to establish a prima facie case, she only needs to plausibly plead her claim. Option Care admits that it terminated Prida's employment eight days after receipt of the affidavits on March 9, 2022, as alleged by Prida.  Given the close temporal proximity between her affidavits and her termination, Prida has plausibly pled the causation element of her retaliation claim.

### C. Exhaustion of Administrative Remedies.

The district court rejected Option Care's exhaustion of remedies argument in connection with its motion to dismiss.  Nonetheless, Option Care seeks to renew this argument with this court. The district court's rejection of this argument is

17

justified by the principle that EEOC filings by lay complainants, such as Prida,

must be liberally construed by the courts.  For example, the plaintiff in *Benzaoual*

*v. Ohiohealth Corp*., No. 2:19-cv-3366, 2021 WL 2712174, **8-9 (S.D. Ohio July

1, 2021) was permitted to pursue his race discrimination charge even though he

failed to check the race discrimination box in his *pro se* EEOC charge.  First, there

clearly is no "retaliation" box Prida could have checked in her EEOC charge.

Prida's EEOC Charge, R. 12-3, PageID#146.  Second, requiring Prida to know that

she has a legally valid claim for retaliation would hold her to the standard of an

attorney in her EEOC filing.  Third, as stated in *Younis v. Pinnacle Airlines, Inc.*,

610 F.3d 359, 362 (6th Cir. 2010):

> [B]ecause aggrieved employees—and not attorneys—usually file
> charges with the EEOC, their *pro se* complaints are construed
> liberally, so that courts may also consider claims that are reasonably
> related to or grow out of the factual allegations in the EEOC charge.
> *Randolph v. Ohio Dep't of Youth Servs.,* 453 F.3d 724, 732 (6th
> Cir.2006).  As a result, 'whe[n] facts related with respect to the
> charged claim would prompt the EEOC to investigate a different,
> uncharged claim, the plaintiff is not precluded from bringing suit on
> that claim.' *Davis v. Sodexho,* 157 F.3d 460, 463 (6th Cir.1998).

Prida included language in the narrative portion of the EEOC charge that

could be interpreted as claiming retaliation.  Namely, Prida stated, "Also, during

my employment, the Respondent breached my confidentiality when sharing my

vaccination status with employees who didn't need to know."  Prida's EEOC

Charge, R. 12-3, PageID#146.  Under the liberal construction afforded to *pro se*

filers at the EEOC, this can be interpreted as claiming retaliation to the extent that an EEOC investigator would have been prompted to investigate a retaliation claim.

**V.    The District Court's Sua Sponte Dismissal of Plaintiff's O.R.C. §4112.02 Claim for Disparate Treatment Based on a Failure to Accommodate Reflects a Misunderstanding of the Claim.**

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc.,* 576 U.S. 768, 773 (2015), states that "the rule for disparate-treatment claims based on a failure to accommodate is straightforward: An employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions." As a result "[i]f the applicant actually requires an accommodation of that religious practice, and the employer's desire to avoid the prospective accommodation is a motivating factor in his decision, the employer violates Title VII." *Id*., at 773-74.

*Abercrombie* explains that "religious practice is one of the protected characteristics that cannot be accorded disparate treatment and must be accommodated." *Id.,* at 775.  Further, "Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices.  Rather, it gives them favored treatment…" *Id*., at 775.  Moreover, "…it is no response that the subsequent [adverse action] was due to an otherwise-neutral policy.  Title VII requires otherwise-neutral policies to give way to the need for an accommodation." *Id*., at 775.

*Abercrombie* interprets statutory language that precludes discrimination against an individual because of their religion, which includes "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to" a "religious observance or practice without undue hardship on the conduct of the employer's business." *Id.*, at 771-72. In essence, *Abercrombie* holds that this language precludes adverse action because of a religious practice unless there is undue hardship to the employer's business. Under this reading, the religious practice is the protected trait and adverse action because of this trait is precluded unless the employer demonstrates undue hardship. As a result, *Abercrombie* concludes that religious practices are entitled to favored treatment which requires otherwise-neutral policies to give way to the need for accommodation.

Accordingly, Prida does not need to "plead facts sufficient to show that [she] was replaced by a person outside the protected class or otherwise treated differently than similarly situated employees" as required by the district court. Opinion, R. 16, PageID#241. Under *Abercrombie*, Prida "…need only show that [her] need for an accommodation was a motivating factor in [her] employer's decision. *Id.*, at 772. Option Care openly admits that Prida's need for an accommodation was a motivating factor in its decision to fire her, mistakenly

20

believing, contrary to *Abercrombie*, that its purportedly neutral testing policy was a permissible basis for doing so.

*Abercrombie* is applicable to O.R.C. §4112.02 , given that "federal case law interpreting Title VII of the Civil Rights Act of 1964…is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Edelstein v. Stephens*, Case No. 1:17cv305, 2020 WL 1846745 (S.D. Ohio),  citing *Little Forest Med. Ctr. Of Akron v. Ohio Civil Rights Comm'n*, 61 Ohio St. 3d 607, 609-10 (1991). Nonetheless, an important distinction exists in that, "…under the Ohio Civil Rights Act, 'a discrimination claimant may pursue a civil cause of action without first exhausting his administrative remedies.'" *Coles v. Johnny Appleseed Broadcasting Company,* 479 F. Supp. 3d 585, 610 (N.D. Ohio 2020) citing *Harrison v. City of Akron*, 43 F. Appx 903, 905 (6th Cir. 2002).  This means that an O.R.C. §4112.02 retaliation claim would be permitted to go forward, even if the Title VII claim was precluded for failure to exhaust administrative remedies.

Contrary to Option Care's argument, it did not raise the issue that Prida did not plausibly plead that she was treated differently than similarly situated employees.  The argument referenced in Option Care's brief related to whether Prida pled that she is a member of a protected class.  Appellant's Brief, Doc. 21, Page 57.  Of course, that argument fails because for purposes of a disparate-treatment claim based on a failure to accommodate claim under *Abercrombie*, the

21

"religious practice is one of the protected characteristics."  *Abercrombie*, 576 U.S.
768, at 775.

The argument that Prida did not plausibly plead that she was "treated
differently than similarly situated employees was not raised by Option Care, and
therefore was raised *sua sponte* by the district court.  That argument would also not
prevail for the reasons discussed above.  In fact, *Abercrombie* specifically provides
that Title VII does not "limit disparate treatment claims to only those employer
policies that treat religious practices less favorably than similar secular practices."
*Id*., at 775.  In any event, this argument is precluded on procedural grounds as
discussed in Appellant's Brief, the procedural validity of which has not been
disputed by Option Care.

## CONCLUSION

For the above reasons the district court's judgment dismissing the subject
case should be reversed and the case should be remanded for further proceedings in
accordance with law.

22

Respectfully submitted,

/s/ *Thomas W. Connors*
Thomas W. Connors (0007226)
Warner Mendenhall (0070165)
Brian Unger (0096884)
MENDENHALL LAW GROUP
190 North Union Street, Suite 201
Akron, Ohio 44304
(330) 535-9160
tconnors@warnermendenhall.com
warner@warnermendenhall.com
brian@warnermendenhall.com

*Attorneys for Plaintiff-Appellant*
*Leah Prida*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,176 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

*/s/ Thomas W. Connors*
Thomas W. Connors
Attorney for Plaintiff-Appellant

**CERTIFICATE OF SERVICE**

I, Thomas W. Connors, counsel for Plaintiff-Appellant and a member of the Bar of this court, certify that, on July 23, 2024, a copy of the Reply Brief of Plaintiff-Appellant was filed electronically through the appellate CM/ECF system with the Clerk of the Court. I further certify that all parties required to be served have been served.

*/s/ Thomas W. Connors*
Thomas W. Connors
Attorney for Plaintiff-Appellant